FIRST NAT. BANK OF EL CENTRO v. HARPER.

(Circuit Court of Appeals, Ninth Circuit.   December 2, 1918.)

No. 3175.

BANKRUPTCY ⬄303(3)—VOIDABLE PREFERENCES—PAYMENTS TO BANK.

Evidence *held* to sustain a finding that orders given by bankrupt, then known to be insolvent, to a bank where he had an overdraft, were not for deposit in the usual course of business, nor pursuant to prior arrangement, but on express understanding that they should be applied on the overdraft, and constituted a voidable preference.

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Action by W. F. Harper, trustee in bankruptcy of H. G. Faubion, against the First National Bank of El Centro.   Judgment for plaintiff, and defendant brings error.   Affirmed.

The defendant in error, the trustee of the estate of H. G. Faubion, who was adjudged a bankrupt upon an involuntary petition filed October 11, 1913, brought this action against the plaintiff in error to recover $12,728 as a voidable preference.   On and prior to September 1, 1913, one H. F. Davis, conducting a creamery business under the name of H. F. Davis Creamery Company, was doing his banking business with the plaintiff in error, hereinafter called the bank.   He would purchase cream from ranchers, and from it make butter at El Centro, and consign the butter principally to Barber & Thompson, of Los Angeles.   His property, consisting of the creamery, some automobiles, and other personal property, was covered by a mortgage to the bank for the sum of $2,000.   For the cream which the creamery purchased from farmers it issued pay checks payable the 10th of each month.   The merchants who purchased the butter did not always remit prior to that date, and the creamery was allowed to overdraw its account at the bank to meet its pay checks to farmers due on the 10th.   This process was repeated each month.

About September 1, 1913, Davis sold the creamery to the bankrupt.   The bankrupt paid Davis $7,500 and assumed all the outstanding liabilities.   The $7,500 which Davis received was the money then due from Barber & Thompson for butter which Davis had sold them, but for which the ranchers who had furnished the cream had not been paid.   On September 4, 1913, there was a balance in the bank of $53.75.   About that time the bankrupt applied to the bank for continued credit upon the same terms as those previously given to Davis.   Between that date and September 10 he drew pay checks to farmers aggregating over $12,000.   On September 15 and 29, 1913, the bankrupt gave to the bank orders on Barber & Thompson and the Crescent Creamery Company, at Los Angeles, to which the bankrupt had transferred the business which had been formerly conducted with the Barber & Thompson company.   The Crescent Creamery Company, upon such order, paid to the bank, September 29, $4,000, which was placed to the credit of the bankrupt, and reduced his overdraft to the amount of $4,133.17.   The overdraft was thereafter increased by checks until October 5, when the bank received from the Crescent Creamery Company $4,904.49 and from Barber & Thompson $1,546.73 on the orders previously given by the bankrupt to the bank, leaving a balance in the bank of $260.67, which was subsequently paid to the trustee in bankruptcy.

It was the contention of the defendant in error that all payments made to the bank upon orders given by the bankrupt subsequent to September 18, 1913, were transfers made by the bankrupt as preferences, and received by the bank as such.   It was the contention of the bank that it did all its busi-

ness with the bankrupt in due course of business, that it had a lien upon all the moneys deposited by the bankrupt or received from orders which he gave, and that it had the right to set off and apply the same upon the bankrupt's overdrafts. The court submitted to the jury the question whether the bankrupt was insolvent at the time when he made any transfer to the bank, and whether the transfer enabled the bank to obtain a greater percentage of its debts than any other creditor of the same class, and whether at the time of the transfer the bankrupt had reasonable cause to believe that the same would effect a preference.

The jury returned a verdict for the defendant in error for the sum of $6,045.50, having found that said transfers from the Crescent Creamery Company and the Barber & Thompson Company created preferences.

Lynn Helm, of Los Angeles, Cal., and Phil D. Swing, of El Centro, Cal., for plaintiff in error.

Dan V. Noland and Walter B. Kibbey, both of El Centro, Cal., and Duke Stone and H. E. Wassell, both of Los Angeles, Cal., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The assignment of error upon which the bank relies is the denial of its motion, made at the close of the case, for an instructed verdict in its favor. It cites New York County Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380, in which it was held that the balance of a bank account at the time of filing the petition is a debt due to the bankrupt from the bank, and that in the absence of fraud or collusion between the bankrupt and the bank, with a view of creating a preferential transfer, the bank need not surrender such balance, but it may set it off against notes of the bankrupt held by it. In the opinion the court said:

"It is true that the findings of fact in this case establish that at the time these deposits were made the assets of the depositors were considerably less than their liabilities, and that they were insolvent; but there is nothing in the findings to show that the deposit created other than the ordinary relation between the bank and its depositor. The check of the depositor was honored after this deposit was made, and for aught that appears Stege Bros. might have required the amount of the entire account without objection from the bank, notwithstanding their financial condition."

Again, the court said:

"As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for, when he parts with the money, he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift, or security."

Among other cases cited for the bank are Continental Trust Co. v. Chi. Title Co., 229 U. S. 435, 33 Sup. Ct. 829, 57 L. Ed. 1268, and Studley v. Boylston Bank, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313. In the first of those cases the court said that it was the main purpose of Bankruptcy Act July 1, 1898, c. 541, section 68b, 30 Stat. 565 (Comp. St. § 9652), to prevent debtors of the bank from acquiring claims against the bankrupt for use by way of set-off and reduction of their indebtedness to the estate. Said the court:

"There is no question of the solvency of Prince when he deposited the money to secure the certificates, and what was done was not the acquisition of a claim against Prince with a view to setting it off against the bank's indebtedness on the certificates, but was the satisfaction, without diminution of the estate of the bankrupt, of possible claims of others who, in the event of Prince's default, would have been entitled to the deposits represented by the certificates. We do not think such transaction comes within the language or reason of section 68b."

In the second case the court said:

"There is nothing in the statute which deprives a bank, with whom an insolvent is doing business, of the rights of any other creditor taking money without reasonable cause to believe that a preference will result from the payment."

In that case the referee had found as a fact that the bank had no reasonable cause to believe that a preference would result. The court further said:

"The money so deposited was the proceeds of the sale of tickets to a large party of round the world tourists, and was put in bank, not for the purpose of preferring it, but in the expectation of being used for carrying on the business in the future as in the past. Indeed, the payments were made with the statement that the company would expect the bank to discount other notes. We find nothing in the record to indicate that the deposits were made for the purpose of enabling the bank to secure a preference by the exercise of the right of set-off."

But we find in the present case evidence which, if credited by the jury, was sufficient to distinguish the case from the cases so cited, and to justify the trial court in denying the motion for an instructed verdict. There was evidence: That on September 15 the bankrupt went to his attorney and told him he was unable to run the business any further. That he and his attorney then went to the office of Wachtel, the cashier of the bank, to whom the attorney repeated what the bankrupt had said, and further stated that the bankrupt had asked him (the attorney) to file a voluntary petition in bankruptcy for him. That Wachtel then requested that the bankrupt give an order on Barber & Thompson for the proceeds of the butter that was being shipped to Los Angeles, and said that the bank would try to carry the business along. That the order was thereafter given. That about the 28th or 29th of September the bankrupt and his attorney again went to Wachtel and the attorney stated to Wachtel that the bankrupt had renewed his request that he file a petition in bankruptcy. That his business was bankrupt. That the pay roll for help would come due the 1st of October, amounting to $2,000, and that the bankrupt had stated that Wachtel refused to pay any more advances to the creamery patrons because the overdraft had grown to such an extent that he did not feel it safe. That Wachtel replied, "This business is insolvent, and I cannot advance any more money," to which the attorney answered: "You are between the devil and the deep sea. The pay roll will be due here on the 1st. They have got a large overdraft at the bank. If you commence a suit against the business to recover your overdraft, these laborers, whose accounts have not been paid, amounting to nearly $2,000, will be preferred claims, and you would have it to pay anyway, and if you don't advance

the money on the pay roll on the 1st, when their wages are due, we will close the business up, and they will be preferred claims anyway." That Wachtel said that he would advance enough more money to take care of the pay roll as it came due on the 1st, "provided you will give me another order for all of the proceeds of the business on the Crescent Creamery Company to whom you are now sending butter." That the bankrupt agreed and the order was given. That at that time the bank knew that the bankrupt was owing $20,000, to ranchers who had furnished cream.

The cashier, testifying as to the method of doing business with the creamery under the Davis management, stated that the overdraft would occur generally from the 10th of the month to a few days there following, and would be paid by deposits of checks which the creamery received for the sale of the butter, but that upon receiving the orders from the bankrupt on Barber & Thompson and the Crescent Creamery Company, an officer of the bank immediately went to Los Angeles (200 miles away), and received the money directly from those companies, although the bank thereafter credited the same upon its books as deposits by the bankrupt. When asked by the court if the orders on Barber & Thompson and on the Crescent Creamery Company were given for the purpose of depositing the money to his account, the bankrupt answered that it was to secure the bank for its overdraft, but that it was put into his deposit account.

This is not a case where there was a previous agreement between a bank and a depositor that the latter should assign accounts to the bank for collection to pay overdrafts as they might occur, for the court below instructed the jury that, if an assignment of accounts was effected prior to the overdraft of September 18 of $12,928.09, the plaintiff was not entitled to recover any sum from the bank, but that, if there was no assignment before September 18, the jury should take into consideration whether such an assignment was then a preference, and, if they found that it was, the bank would not have the right to apply any of the proceeds of such assignment on the overdraft. The jury have found by their verdict that there was no such prior assignment. Nor is this a case where there is absence of evidence to show that the moneys so collected by the bank were deposits created otherwise than in the ordinary relation between a bank and its depositor. Here there was evidence that the accounts were assigned and the proceeds were received by the bank, not in the usual course of banking business, but with the specific understanding that they were to be applied to the reduction of the overdraft. In Traders' Bank v. Campbell, 14 Wall. 87, 20 L. Ed. 832, the depositor gave his bank a check for the balance of his account, which the bank applied to his indebtedness. It was the contention of the bank in that case that, as it had a right to set off its claim against the deposit, it was immaterial that the same thing was accomplished by the check. But the court held that the transaction was a payment, and not a set-off, since both the parties thereto knew of the depositor's insolvency and that the payment was a preference. That ruling was followed in In re Starkweather & Albert (D. C.) 206 Fed. 797, and of similar import are In re National Lumber Co., 212 Fed. 928, 129 C. C. A. 448; Knoll v. Commercial

Trust Co., 249 Pa. 197, 94 Atl. 750, L. R. A. 1916A, 683, Ann. Cas. 1916C, 988; Johnson v. Gratiot County Bank, 193 Mich. 452, 160 N. W. 544; National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115; Mechanics' Bank v. Ernst, 231 U. S. 60, 34 Sup. Ct. 22, 58 L. Ed. 121; Ernst v. Mechanics & Metals Nat. Bank, 201 Fed. 664, 120 C. C. A. 92.

The bank asserts that there is no evidence of the amount of the bankrupt's estate, and that therefore there is absence of proof that the transfers to the bank enabled it to obtain a greater percentage of its debt than any other creditor of the same class will receive. But such proof was unnecessary, in view of the undenied allegation of the complaint that the assets of the estate are not sufficient, including the sum of $12,728, the amount sought to be recovered in the action, to satisfy the claims of the creditors of the bankrupt. There was proof, however, that the bankrupt had no money or assets when he went into the business; that he diverted from the assets which he purchased $7,500 to pay Davis; that the creamery plant and personal property which he bought was worth $6,000 or $7,000, on which the bank held a mortgage for $2,000, and that on the mortgage the bank subsequently acquired the property; that claims against the estate aggregating $6,574.13 had been presented and allowed, and claims aggregating $10,798.23 had been presented and not yet allowed. This showing was clearly sufficient.

The judgment is affirmed.