### In re ALMOND-JONES CO, Inc.

(District Court, D. Maryland. May 20, 1926.)

1. **Bankruptcy ⬅=178(1)—Validity of assignment of accounts receivable by bankrupt before insolvency depends on whether arrangement allowed him unfettered dominion over accounts and proceeds.**

Validity of assignment of accounts receivable by bankrupt before insolvency depends on whether arrangement was such that bankrupt retained unfettered dominion over assigned accounts and their proceeds.

2. **Bankruptcy ⬅=178(1)—Bankrupt's assignment before insolvency of accounts receivable, under which proceeds as collected were deposited in bank holding assignment, with right in bankrupt to withdraw funds, held invalid.**

Assignment of accounts receivable by bankrupt to bank before insolvency, under which accounts were collected by bankrupt and proceeds deposited in bank, subject to withdrawal, but with agreement that bank might apply proceeds on debt at any time, *held* invalid.

3. **Bankruptcy ⬅=165(1)—Bank, having assignment of bankrupt's accounts with collateral note providing for lien on deposit, held justified on insolvency in applying balance on payment of note (Bankruptcy Act, § 68 [Comp. St. § 9652]).**

Where collateral note given to bank by bankrupt, with assignment of accounts receivable, provided for lien on balance of bankrupt's deposit containing proceeds of accounts as collected, bank was justified, on determining bankrupt's insolvency, in applying balance of deposit as payment on note, not only because of provisions therein, but also by right of set-off, under Bankruptcy Act, § 68 (Comp. St. § 9652).

4. **Bankruptcy ⬅=166(3)—Bank's right of set-off of bankrupt's deposit does not exist if deposits are made with bank's knowledge of insolvency, in order that deposits may be applied on indebtedness.**

Although right of bank to set off deposits of bankrupt against debt exists when deposits are made in usual course of business, it does not exist if deposits are made with knowledge of bank of insolvency, in order that bank may apply them to reduction of indebtedness.

5. **Bankruptcy ⬅=166(2)—Application on indebtedness of funds collected on assigned accounts and deposited in assignee bank held improper, where deposits were made with expectation that they would be so applied.**

Where assignment of accounts receivable given to bank by bankrupt was invalid, application on indebtedness of proceeds collected and deposited *held* improper as a preference, where deposits were made with expectation that they would be so applied.

6. **Bankruptcy ⬅=166(3)—Bankrupt's assignment of accounts after known insolvency, under circumstances showing that parties understood proceeds were to be delivered to assignee, held valid.**

Assignment of accounts by bankrupt after known insolvency as security for loans, made under such circumstances that both parties must have understood that proceeds were to be delivered to assignee, *held* valid.

7. **Bankruptcy ⬅=172—On bankrupt's giving different assignments of accounts after insolvency as security for present loans, with collateral notes extending security to other indebtedness, proceeds may be applied to payment, not only of note it secures, but deficiency in other note.**

Where, after insolvency, bankrupt gave two different assignments of accounts to secure payment of loans then made, with collateral notes making accounts security for all other present and future indebtedness, proceeds of accounts may be applied to payment of either note, in case of deficiency in accounts assigned as security therefor.

In Bankruptcy. In the matter of the bankruptcy of the Almond-Jones Company,

Inc. On petition by the Union Trust Company of Maryland for a decree that sums of money collected on accounts receivable be turned over to it, and that title to uncollected sums reside in petitioner. Case referred to referee to state account in accordance with opinion.

Walter H. Buck, of Baltimore, Md., for Union Trust Co.

Carl R. McKendrick, Charles G. Baldwin, and James J. Carmody, all of Baltimore, Md., for trustee.

SOPER, District Judge. Almond-Jones Company, Inc., was adjudged bankrupt by this court in proceedings commenced December 23, 1925, when an order of adjudication was made and a receiver in bankruptcy was appointed. Certain accounts receivable of the bankrupt were collected by the receiver and by the trustee in bankruptcy, who succeeded him. Union Trust Company of Maryland, hereinafter called the bank, filed a petition in the case, praying a decree that the sums of money so collected be turned over to it, and that title to all the accounts receivable of the bankrupt, remaining uncollected, resides in the petitioner. The answer of the trustee denies the title of the bank and resists the relief prayed, claiming that the trustee has title to all the accounts receivable collected and uncollected. The answer therefore prays the court to dismiss the bank's petition, and in addition, by way of cross-relief, that the bank be required to pay over to the trustee the proceeds of certain accounts receivable received by it from the bankrupt before adjudication, but after it had knowledge of the company's insolvency.

The most important question in the case concerns the validity of an assignment on November 1, 1925, to the bank of all the accounts receivable of the company then outstanding. On that day a list of the accounts, owing at the end of the preceding month, was prepared. There was stamped upon each account, as it appeared on the ledger, a statement that the account had been assigned to the bank for value received. The list of accounts contained a similar statement and was signed by the treasurer of the company. The aggregate of the accounts was $85,492.63. On November 2, 1925, the bank loaned the bankrupt the sum of $75,000 upon its promissory note, payable on demand, for the payment of which the assignment was given as collateral security. The proceeds of the note were used in payment of the company's promissory note of like character and amount, dated October 1, 1925. This transaction was in accordance with the course of dealing between the parties, which had been in effect for upwards of three years.

The bankrupt had kept its only active checking account with the bank since March, 1922, and had borrowed money from it from time to time since that date, giving assignments of all its accounts receivable as collateral security. As each new account was entered on the ledger, notice of assignment was placed thereon. During the first six months of the period the bankrupt made daily reports to the bank of the charges and collections on the accounts. Since the daily reports entailed considerable labor, they were abandoned in the fall of 1922, and in lieu thereof the bankrupt made monthly reports and renewals of its promissory notes, precisely as it did on November 1, 1925. No attempt was made by the bank to notify the debtors of the assignments. It was agreed between the parties that, so long as it was satisfactory to the bank, the company should continue to collect the accounts, but that all the proceeds thereof were to be deposited with the bank. These deposits were credited in the company's active account, and were subject to its withdrawal at will, and as a matter of fact were used by the company in the course of its business, which was conducted without interference on the part of the bank. The bank exercised no other control, except that on a few occasions during the three years preceding November, 1925, it sent representatives to the company's place of business to inspect its ledgers, and to see that notice of assignment was stamped upon each account receivable.

The bank felt that the assignment was complete, and that it had adequate control of the accounts receivable and of the proceeds, on three grounds: (1) There was an oral agreement between the parties that the bank at any time might take the checks of the debtors given in payment of the accounts and apply the proceeds in the reduction of the bankrupt's notes; (2) the collateral notes given by the bankrupt, including the note of November 2, 1925, contained a provision that, if at any time the collateral should be deemed unsatisfactory to the bank, the company would, on demand, give new or additional collateral, and in case of default the note, at the option of the bank, should become due and payable, and a further provision whereby the bank was given a lien for the debt, not only upon the assigned accounts, but also upon any balance of the deposit account,

whereby the bank was authorized at any time to place such deposit to the payment in whole or in part of the note; (3) the bank had, it believed, a so-called bankers' lien on the deposit, independent of the provisions of the oral agreement and of the collateral notes.

When the note of November 2, 1925, was given, it was believed by the parties that the company was solvent; but shortly thereafter it was discovered that it was insolvent, and that it would be necessary to close the business, unless new capital were found, and unless the creditors should accept a composition. Notice of this condition was given the bank on November 18, 1925. On that day there was $20,794.01 on deposit to the credit of the company. The bank was sympathetic with the desire of the company that an extension be granted, and took no steps to precipitate bankruptcy proceedings; but, in order to protect itself, it transferred $20,000 from the company's account on November 19, 1925, and credited that amount upon the note. The company continued until adjudication to deposit the collections with the bank, aggregating in all the sum of $19,512.99. The bank withdrew additional sums to the amount of $12,838.23 from the account, and credited them to the note, and finally, on December 24th, the day after adjudication, the same application was made of the balance of $2,001.02 then remaining. At that time the bankrupt was indebted to unsecured creditors in a sum in excess of $50,000.

[1] The validity of the assignment depends upon whether or not the actual arrangement between the bankrupt and the bank was such that the bankrupt retained unfettered dominion over the assigned accounts and their proceeds. The rule governing such cases is sufficiently set out in the decision of the Circuit Court of Appeals of the Fourth Circuit in Chapman v. Emerson, 8 F.(2d) 353, which went up from this district, and in Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991, therein referred to. In the first case the bankrupt assigned substantially all of its accounts to an unincorporated association as security for the payment of certain loans. The accounts were to be collected by the bankrupt and the proceeds paid over to an agent of the association. The same individual was the agent of the association and an active officer of the bankrupt. When the bankrupt collected the assigned accounts, it did not always turn over the proceeds to the association, but, with the consent of the agent, usually replaced the collected accounts with others of later date. The court held

that the case was close, but that the assignment was made in good faith for present consideration, and that, although the association had not always insisted on the full measure of its rights, it had never intended to surrender, and had not in fact surrendered, to the bankrupt anything approaching unfettered dominion over the accounts or their proceeds. The validity of the assignment was therefore upheld.

On the other side of the line is the case of Benedict v. Ratner, where the facts were as follows (see 268 U. S. 359, 45 S. Ct. 566, 69 L. Ed. 991): The Hub Carpet Company was on May 23, 1921, a mercantile concern doing business in New York City and proposing to continue to do so. The assignment was made there to secure an existing loan of $15,000, and further advances not exceeding $15,000, which were in fact made July 1, 1921. It included all accounts receivable then outstanding and all which should thereafter accrue in the ordinary course of business. A list of the existing accounts was delivered at the time. Similar lists were to be delivered to Ratner on or about the 23d day of each succeeding month, containing the accounts outstanding at such future dates. Those enumerated in each of the lists delivered prior to September aggregated between $100,000 and $120,000. The receivables were to be collected by the company. Ratner was given the right, at any time, to demand a full disclosure of the business and financial conditions, to require that all amounts collected be applied in payment of his loans, and to enforce the assignment, although no loan had matured; but, until he did so, the company was not required to apply any of the collections to the repayment of Ratner's loan. It was not required to account in any way to Ratner. It was at liberty to use the proceeds of all accounts collected as it might see fit. The existence of the assignment was to be kept secret. The business was to be conducted as theretofore. Indebtedness was to be incurred as usual, for the purchase of merchandise and otherwise in the ordinary course of business.

The amount of such indebtedness unpaid at the time of the commencement of the bankruptcy proceedings was large. Prior to September 17th the company collected from accounts so assigned about $150,000, all of which it applied to purposes other than the payment of Ratner's loan. The outstanding accounts enumerated in the list delivered September 23d aggregated $90,000. The receiver and trustee collected the book accounts.

Ratner filed a petition, praying that the amount so collected be paid over to him, claiming under the assignment of May 23d; but the petition was resisted on the ground that the original assignment was void under the law, and that therefore the delivery of the September list was inoperative to perfect a lien in the lender. The trustee filed a cross-petition asking that the lender be ordered to pay to the estate the proceeds of certain collections made by the bankrupt and turned over to him after September 17th, when the company was insolvent, and the lender had reason to believe it so.

The Supreme Court, declaring that the rights of the parties depended primarily upon the law of New York, held that the transfer of the accounts as security, reserving to the bankrupt the right to dispose of the same, and to apply the proceeds thereof to his own uses, was, as to creditors, fraudulent in law and therefore void. It said that, whether collateral consists of chattels or of accounts, reservation of dominion inconsistent with the effective disposition of title must render the transaction void. Although an agreement that the assignor of accounts shall collect them and pay the proceeds to the assignee will not invalidate the assignment which it accompanies, the assignment must be deemed fraudulent in law, if it is agreed that the assignor may use the proceeds as he sees fit. Therefore the arrangement precluded the effective creation of a lien, and rendered the original assignment fraudulent in law. Accordingly it was held that the payments to Ratner and the delivery of the September list of accounts were inoperative to perfect a lien to him, and were unlawful preferences. On this ground, and also because the payment was fraudulent under the law of the state, the trustee was entitled to recover the amount.

The case at bar bears a striking similarity to Benedict v. Ratner, but differs in that, the lender being here the bank, it was agreed that the collections should be deposited therein, and that it could appropriate them at any time. This arrangement unquestionably made it easy for the bank to take control of the funds whenever it saw fit to do so; easier, in fact, than it was for Ratner in his case to require the application of the amounts collected in payment of his loan. But, on the other hand, until the lender should interfere, the privilege of the borrower to use the funds was as free in one case as in the other. The deposit of the funds with the bank provided a means of enforcing the agreement, but did not modify either the terms of the agreement or the actual practice whereby the company used the collections without restraint in the course of its business. There was no agreement, as in Chapman v. Emerson (C. C. A.) 8 F.(2d) 353, that the proceeds of the accounts receivable should be paid to the lender. The agreement to deposit was not equivalent to an agreement to pay, for there is a substantial difference between the payment of money by a borrower to a bank in liquidation of an indebtedness and the deposit of funds in the bank by the borrower, subject to the borrower's right of withdrawal in the ordinary course of his business, as. will more fully appear in the discussion set out below. New York County Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380. The bank, in the case at bar, did not in fact appropriate the funds until after it had knowledge of insolvency, and in the meantime the actual control and dominion of the funds enjoyed by the bankrupt was as unfettered as it was in the case of Benedict v. Ratner.

[2, 3] It follows that the assignment of November 1, 1925, was invalid. Nevertheless the bank was entitled on November 19, 1925, to withdraw the sum of $20,000 from the bankrupt's account, and to apply it as a payment on the note of November 2, 1925. This action was justified, not only by the provisions of the collateral note, but also by the bank's right of set-off under section 68 of the Bankruptcy Act (Comp. St. § 9652), and the fact that the money was withdrawn prior to adjudication does not affect the situation. Indeed, the bank might lawfully have withdrawn the entire balance of $20,794.01. New York County National Bank v. Massey, supra; Studley v. Boylston National Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313; Fourth National Bank v. Smith, 240 F. 19, 153 C. C. A. 55.

A different question, however, arises in regard to subsequent reductions of the note. The bankrupt continued to collect its accounts receivable, and deposited them in the bank in the aggregate sum of $19,512.99 between November 18 and December 23, 1925. On December 1, 1925, the bank charged the account with $338.23 interest on the note. On December 5th the balance in the account was $5,336, whereupon the bank withdrew $5,000 therefrom and applied it to the payment of the note. Again, on December 17th, the account having in the meantime been increased by additional deposits, the bank withdrew $7,500, leaving a balance of $981.21. Finally, on December 24th, the day after adjudication, the amount in the account was

$2,001.02, which the bank also applied to the reduction of the note. In all the bank received $34,839.25 of its indebtedness.

During the same period of five weeks, other withdrawals from the account were made on the check of the bankrupt, amounting in all to $5,473.65, which were applied to the purposes of the business. Of this amount $4,775 was paid in salaries and wages, $450.-22 to make good bad checks of debtors, and $248.43 in petty expenses. These expenditures were not made entirely from deposits of collections of accounts assigned November 1st, because two additional loans, aggregating $2,095, were made by the bank to the bankrupt during this period, and were secured by additional assignments, which are hereinafter discussed.

It is obvious that, in the interval between November 19th and December 23d, the business was at a standstill. Various plans to save it were put forward and considered by the bankrupt, the bank, and other creditors. It soon became clear to them, not only that the business was insolvent, but that it could not go on unless additional working capital in the sum of $40,000 was secured, and unless the creditors would consent to a substantial reduction of their claims. Certain friends and relatives, possessed of the necessary means, expressed a willingness to subscribe the aggregate sum of $26,000 to the capital stock. Negotiations to secure subscriptions from other persons were carried on. The bank indicated that it would restore the former line of credit, secured by accounts, and would grant $10,000 additional unsecured credit. As to the other creditors, one of them believed that a fair cash settlement would be 50 cents on the dollar, while the largest creditor contended that 33⅓ cents would be ample, and agreed upon tentative terms of settlement.

It was suggested that the creditors be given preferred stock for the balance of their claims. But contracts were not executed, either by prospective subscribers to stock or by the creditors; nor were the propositions of either class intended to be legally binding, but all were contingent upon the formation and accomplishment of a practical plan providing for an increase of capital and a reduction of indebtedness, which was in fact never consummated. It was a period of earnest endeavor and high hopes, and officials of the bank and of the bankrupt believed that the desired organization would come to pass. Nevertheless the one stubborn fact was the insolvency of the company, and all hopes of reorganization were destroyed by the action of certain creditors, whereby the proceedings in bankruptcy were instituted in this court. Meanwhile the bank kept a tight hand on the funds, and only such expenditures were made by the company as were necessary to keep its doors open.

[4] The question then arises whether the bank was justified in applying the moneys deposited after it had knowledge of the company's insolvency to the payment of its note. The solution depends upon the purpose with which the deposits were made and accepted— whether they were made in the ordinary course of business, with the expectation and intent that they might be withdrawn at will by the bankrupt, or whether, on the other hand, they were made to build up the account, so that it would be applied to the payment of the bank's claim. The bank relies upon the cases of New York County Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380, Studley v. Boylston Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313, and Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., Trustee, 229 U. S. 435, 33 S. Ct. 829, 57 L. Ed. 1268.

In these cases it is laid down that, in the absence of fraud or collusion between the bank and the depositor, with a view of creating a preferential transfer, the bank need not surrender the balance in the bank account at the time of the filing of the depositor's petition in bankruptcy, but may set it off against the depositor's indebtedness and prove its claim for the amount remaining due. Certain deposits in New York County Bank v. Massey were made after the bank had notice of insolvency; but there was nothing in any of these cases to show that the deposits created other than the ordinary relation between the bank and the depositor—that is to say, the relation of debtor and creditor, with the superadded obligation that the money is to be paid when demanded by a check. Nor was there any evidence to show fraud or collusion between the parties, with a view of creating a preferential transfer of the bankrupt's property to the bank. It was held, therefore, that the effect of such deposits was to create a debt due the bankrupt, and was not a diminution of his estate. The Supreme Court considered the possibility that the right of the bank under such circumstances might be abused, but it declared (229 U. S. 529, 33 S. Ct. 806, 57 L. Ed. 1313) that the remedy against that evil was found in the fact that the trustee is authorized to sue and recover, when it is shown that, after insolvency, the

money was deposited for the purpose of enabling the bank to secure a preference.

These decisions have been cited in a large number of cases, including the following decisions by Circuit Courts of Appeal: Fourth National Bank v. Smith, 240 F. 19, 153 C. C. A. 55; First National Bank v. Harper, 254 F. 641, 166 C. C. A. 139; German-American State Bank v. Larimer, 235 F. 501, 149 C. C. A. 47; Merrimack National Bank v. Bailey (C. C. A.) 289 F. 469; and American Bank & Trust Co. v. Coppard, 227 F. 597, 142 C. C. A. 229—and it has become the settled rule that, while the right of set-off exists when the deposits are made in the usual course of business, and it is expected that the checks of the depositor will be honored when presented, it does not exist if the deposits are made with knowledge on the part of the bank of the depositor's insolvency, in order that the bank may apply them to the reduction of the indebtedness, for, in the latter case, there is in effect a preferential payment in fraud of creditors.

[5] It is clear in the case at bar that both the bank and the bankrupt supposed that the assignment of the accounts was valid, and that, even after insolvency, it was the duty of the bankrupt to continue to make the deposits and the right of the bank to apply them to the reduction of the note. The parties had no actual intent to defraud the creditors; but, since the assignment was invalid in law, the transaction in law was fraudulent, for there is no doubt that the parties intended at the time that the deposits were made that they should be applied in the manner which actually occurred. It was possible that the effort to get new capital and compromise with creditors might be successful, and that the bank would make a new loan and restore the funds withdrawn; but, in the meantime, the deposits were made, not with the belief that the company might withdraw them at will, but with the expectation that they would go, as the $20,000 had gone, to the bank. Therefore all of the withdrawals, except the first withdrawal of $20,000, were improperly made, and should be charged against the bank in its accounting with the trustee. On the other hand, the bank should be credited with the sum of $794.01, the amount in bank at the close of business on November 18, over and above the sum of $20,000 withdrawn.

Heretofore the discussion as to the validity of the assignments has been limited to the assignment of November 1, 1925; but there were two other subsequent assignments, which stand on a different basis. It has been observed that the bank permitted withdrawals of funds after November 18th by the company, in order that it might meet its pay rolls, which amounted to $895 weekly. This sum was withdrawn for each of three weeks subsequent to notice of insolvency. The pay roll for the fourth week, ending December 11th, was provided by an additional loan of $1,200 by the bank on the demand note of the company, secured by an assignment of accounts aggregating $1,640.36, created subsequent to the assignment of November 1st. On December 11th, the bank balance was $4,701.37, so that the loan was not necessary. There is no direct testimony on the point, but the fair inference is that the new loan and the new assignment were made because the bank preferred to make a new loan on new accounts during the period of attempted reorganization, rather than to permit the withdrawal of additional funds from the account, and thus deplete the collateral upon which it is believed it had a lien for the payment of its loan of $75,000. Again, on December 15th, the bank made a loan of $895 to the company, secured by an assignment of new accounts aggregating $417.08. The balance at this time was $981.25, which was barely enough to meet the pay roll. The testimony shows that this loan was made, partly, at least, for the reason that most of the balance represented uncollected items from Southern points, and the bank was not willing to honor a check upon these funds for pay roll purposes.

[6, 7] The question is whether these last two assignments were made under the same circumstances, and are subject to the same defect, as the assignment of November 1, 1925. It is admitted by the bank that there was no change in the arrangements. But this testimony must be taken to mean that there was no written or oral agreement expressly altering the contract, for it is manifest, as already set out, that a great difference had taken place in the situation, which was obvious to both parties. It could not have been their intention that the company, known to be insolvent, should have the same free use of the proceeds of the accounts, when collected, as it had enjoyed prior to November 18th. The bank had clearly shown that the practice then in vogue was at an end. It had taken possession of the deposits from time to time in the interval, and had withdrawn them for its own use. It must be implied from the circumstances that the parties understood, when the

new assignments were made, that the proceeds of the new accounts were to be delivered to the bank and applied by it to the payment of the notes. These assignments were therefore valid, and the bank is entitled to the proceeds when they become available.

Moreover, since the company gave a collateral note in each instance, whereby the collateral security was given for all other present and future indebtedness, the proceeds of the accounts assigned on December 11th should be applied to the payment, not only of the note of the same date, but also, if necessary, to make up the deficiency in the accounts assigned as security for the note of December 18th. This follows, notwithstanding the insolvency of the company at the time, because the assignment of December 18th was made for a present consideration, and the express provision in the note of December 11th for the application of the collateral to future indebtedness was then outstanding. First National Bank v. Pennsylvania Trust Co., 124 F. 968, 60 C. C. A. 100.

The case will be referred to the referee, to state an account between the parties in accordance with the principles laid down in this opinion.