### GERMANIA SAVINGS BANK & TRUST CO. v. LOEB.

(Circuit Court of Appeals, Sixth Circuit.  May 2, 1911.)

No. 2,081.

1. BANKRUPTCY (§ 154*)—CLAIMS—SET-OFFS.

The right of a bank, which is a creditor of a bankrupt, to apply on its debt as a set-off a balance remaining to the credit of the bankrupt in its current account on the date of the bankruptcy, under Bankr. Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), is not affected by the fact that the debt to the bank was not due.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 451–455; Dec. Dig. § 154.*]

2. BANKRUPTCY (§ 166*)—SET-OFFS—DEPOSITS IN CREDITOR BANK.

A mercantile company, a short time before its bankruptcy and while in fact insolvent, procured a loan from claimant bank. On reports of the company's condition, at the bank's instance, a conference was held between their attorneys in respect to the bank's claim. An inventory and examination of the company's books was then being made, and its attorney, who did not know of its insolvency, requested that the bank wait until it was completed, and agreed that the company should withdraw from the bank no more than it should subsequently deposit. No express agreement was made that the company should be permitted to withdraw the amount of such subsequent deposits, but the bank waited until it became certain that the company was insolvent, when it refused to pay further checks, and applied the deposit on its note. *Held*, that the arrangement with respect to the money on deposit at the time of the conference appeared to have been made in good faith, and did not constitute a preference in favor of the bank; nor was there any waiver by the bank of its rights as to subsequent deposits, and, since they were made by the company without any intention of giving a preference, no preference resulted, and the bank was entitled to the entire deposit in its hands at the time of the bankruptcy as a set-off.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

3. BANKRUPTCY (§ 154*)—"DEBT."

The word "debt," as used in Bankr. Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3450), relating to the setting off of debts against a bankrupt, includes any debt provable in bankruptcy; and a debt is provable, whether due or not at the time of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 451–455; Dec. Dig. § 154.*

For other definitions, see Words and Phrases, vol. 2, pp. 1864–1886; vol. 8, p. 7628.]

Appeal from the District Court of the United States for the Western District of Tennessee.

In the matter of the Block Mercantile Company, bankrupt; Henry C. Loeb, trustee. The Germania Savings Bank & Trust Company appeals from an order requiring it to return a certain sum as a preference as a condition to proving its claim. Reversed.

This is an appeal from an order of the District Court disallowing the claim of appellant against the bankrupt's estate in default of the performance of certain conditions hereafter stated. The proof of claim alleged an indebtedness of the bankrupt to the bank of $10,387.39. The proof was construed as claiming that amount as a balance remaining of $20,000 loaned by the bank, less $9,612.61 deposited by the bankrupt in the bank and applied by the latter as an offset against the original indebtedness. It is alleged in such proof, with reference to the origin of the debt, that on or about January 30, 1908, the bankrupt secured from claimant $20,000, upon representations that the company had a paid-in capital stock of $80,000; that it was a successful corporation, and had made profits in excess of $30,000; that on February 13th claimant first learned of the falsity of said representations, and thereupon demanded back its money. The trustee excepted to the claim upon the grounds, first, that the bank had received a preference of a large amount within four months before the bankruptcy, while the Mercantile Company was insolvent; and, second, that a large amount of the bank deposits were made under an agreement, between the representatives of the bankrupt and the bank respectively, that they should be held as a special deposit, and that no right of offset existed as to such amount.

The referee reported, in substance sufficient for this opinion, the fact of the making of the loan of $20,000 about January 28, 1908; that about February 1st following it became known to the officers of the Mercantile Company that one of its officers was short in his accounts about $4,000, and had forged $6,000 of the stock of the company; that at least one of the officers of the Mercantile Company knew that as much as $35,000 of the capital stock of the company had not been paid for; that part of this forged stock had been hypothecated with appellant; that in order to avoid trouble with one of the stockholders, who had become dissatisfied, the president of the Mercantile Company had bought his stock, giving in part payment therefor the check of the Mercantile Company upon the appellant bank; that, for the purpose of ascertaining the exact condition of the company, its attorney had ordered an inventory taken; that on February 5, 1908, the officers and agents of the appellant bank knew of certain of the irregularities before stated, were advised of the order for taking an inventory, and that the books of the Mercantile Company were being audited, and had sufficient information to put them upon inquiry respecting the insolvency of the Mercantile Company; that the latter was at the time actually insolvent, and that its officers knew it; that on February 5th a conference was had between the respective attorneys of the bank and the bankrupt—the former having sent for the president of the Mercantile Company, and the attorney appearing in his stead, on account of the alleged illness of the president; that both attorneys realized that the Mercantile Company was in a critical condition; that the bank's attorney desired to protect its interests, and that the attorney of the bankrupt "realized that it would be dangerous at that time for any action to be started against the company, and was willing to do anything reasonable to prevent litigation"; that the bankrupt had at the time on deposit in the bank $5,970.23; that the bankrupt's attorney thought that, unless the bank could at once be satisfied, it would refuse to cash checks for the money then on deposit; that the bankrupt's attorney did not then know that his client was insolvent, and stated that he was informed and believed that it was solvent, that it owed not more than $65,000 and had $100.000 of assets, but that the exact condition could not be known until the examination of the books and taking of inventory were completed, and stated that if the bank were to take steps at that time to protect its interests the collapse of the bankrupt's business would result, and asked that no action be taken by the bank, but that

matters "remain as they are," under an arrangement that the Mercantile Company should draw out no more than it should subsequently deposit—thus always leaving a balance equal to the existing balance, and thus the bank be not prejudiced in case the Mercantile Company should prove insolvent; but that, while the evidence did not show whether the bank's attorney replied to this proposition, no objection was made to it, and that, the bank having accepted subsequent deposits, the Mercantile Company's attorney understanding the proposition was satisfactory, the former was bound by the transaction.

It appeared that on February 11th the accounting of the Mercantile Company's affairs was completed, showing that it owed upwards of $138,000, instead of not more than $65,000, as believed by its attorney at the time of the conference of February 5th; that but $28,000 of the $80,000 capital stock subscribed had actually been paid for; and that the inventoried assets amounted, at the valuation placed upon them, to but slightly more than the amount of the debts. The bank, upon learning this situation, on February 11th or 12th, refused to honor further checks of the Mercantile Company, and its checks to the amount of more than $6,000 drawn, and in part issued, for current expenses or current debts, were accordingly either dishonored by the bank or withheld from delivery, by reason of such notification from the bank. On February 13th the latter demanded from the Mercantile Company the return of the $20,000 borrowed, together with check for the balance of the latter's bank deposit, with notice that the bank had already applied the same upon said indebtedness. The creditors' petition for bankruptcy was filed the next day.

The referee held that the arrangement by which the money then on deposit should not be checked against did not constitute a preference under the circumstances of the case, including the fact that the bankrupt's attorney knew that if any of the representations made to the bank, on which the $20,000 was borrowed, were untrue, the latter could repossess itself of the money then on deposit, and that he also must have known that in case of insolvency proceedings the bank would have the right to offset the money then on deposit, and accordingly held that the bank was entitled to offset the balance on deposit February 5, 1908, against the bankrupt's indebtedness. The amounts deposited in the bank after February 5th and until February 13th, less the amount of the checks cashed between those dates, was $4,514.08. The referee held that the Mercantile Company had the right to control its deposits made after February 5th, and that in view of the talk between the attorneys "the bank must receive the deposits as suggested, or decline them"; that it was the intention of the attorney and other officers of the Mercantile Company that the rights of both parties should be fixed on February 5th; and that the subsequent deposits were made by the agents of the Mercantile Company "with the understanding that they were not to be molested by the bank and that they would have the right to withdraw them as they saw fit"; and that as the Mercantile Company's affairs were being conducted by subordinate agents, who were striving to preserve the assets and protect the interests of all creditors alike until the exact condition of the business could be ascertained, the deposits made after February 5th were not made in the ordinary business way, but in such way as to create a trust relation, and thus to preclude a right on the part of the bank to offset them against the Mercantile Company's debt. It was accordingly ordered that upon the payment of the latter balance ($4,514.08), deposited after February 5th, the bank might prove its claim for what remained after making the offset of the balance previous to that date, together with its claim for the $4,514.08 so to be paid in, and that in default of such payment the entire claim should be disallowed.

The referee's order was reviewed by the District Judge, upon petitions therefor by both the bank and the trustee. The judge agreed with the referee as to the facts relating to the deposit balance of February 5th, but was of opinion that the agreement and understanding that the bank should withhold the taking of legal proceedings against the bankrupt until invoices should be taken and the exact condition of the Mercantile Company ascertained, and that the latter should not check against this balance, in connec-

tion with the arrangement for further deposits to be checked against, amounted to the giving of a preference to the bank, under section 60 of the act, and accordingly held that the bank had no right to offset the balance of February 5th against the bankrupt's debt. As to the balance of deposits made after February 5th, the judge approved the action of the referee in holding that such balance was a trust fund, and, while not in formal terms confirming the referee's conclusions of fact, in effect did so, holding that the bank's refusal to honor checks that were drawn by the bankrupt against this subsequent balance, and its attempt to apply the same to the indebtedness which the bankrupt owed the bank, amounted to a conversion. An order was accordingly entered denying the offset of $5,970.23, but providing that upon the payment of that sum to the trustee the bank might prove its claim for the entire amount of the debt, and that in default of such payment the entire claim be disallowed, but adjudging that the bank is a debtor to the estate of the bankrupt in the amount of $4,514.08, and rendering judgment in favor of the trustee accordingly, with interest from February 5, 1908, with provision for the withholding of dividends upon the bank's claim until the last-named sum, with interest, be paid, as well as for issue of execution against the bank for any balance thereof in case the item of $5,970.23, with interest, should not be paid, or in case the dividends did not amount to $4,514.08, with interest. The costs of the proceedings for review were adjudged against the bank. It is conceded by appellee that the proper balance on deposit February 5, 1908, was $5,098.53, instead of $5,970.23, as found by the referee.

Joseph Hirsh, Leo. Goodman, and W. A. Percy, for appellant.

J. C. Wilson and J. W. Apperson (D. E. Myers and K. D. McKellar, on the brief), for appellee.

Before SEVERENS and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

KNAPPEN, Circuit Judge (after stating the facts as above). [1] The first question presented is whether the agreement of February 5th between the Mercantile Company and the bank created, as to the then existing deposit balance of $5,098.53, a preferential transfer within the meaning of the bankruptcy act. Section 60a of the act provides that:

"A person shall be deemed to have given a preference, if, being insolvent, he has, within four months before the filing of the petition * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

Section 68a provides that:

"In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

It has been authoritatively decided by the Supreme Court, in considering these two sections, that the balance of a regular bank account at the time of filing the petition is a debt due to the bankrupt from the bank, and in the absence of fraud or collusion between the bank and the bankrupt, with the view of creating a preferential transfer, the bank need not surrender such balance, but may set it off against notes of the bankrupt held by it, and may prove its claim for the amount remaining due on the notes. N. Y. County National Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380.

The Massey Case is decisive of the question we are considering, unless the case before us is distinguishable either by the fact that the notes here in question were not due at the time of the bankruptcy, or because of the existence of fraud or collusion between the bank and the Mercantile Company, with the view of creating a preferential transfer.

As to the nonmaturity of the notes:

[3] The word "debt," as used in section 68a includes any debt provable in bankruptcy. Bankr. Act 1898, § 1, cl. 11; Loveland on Bankruptcy (3d Ed.) p. 369. And a debt is provable, whether due or not at the time of bankruptcy. Bankr. Act 1898, § 63a (1). It is thus immaterial to the application of section 68a whether or not the notes were due. Collier on Bankruptcy (8th Ed.) p. 793; Loveland on Bankruptcy (3d Ed.) p. 372; Moch v. Market St. National Bank (3d Circuit), 107 Fed. 897, 47 C. C. A. 49; In re Semmer Glass Co. (2d Circuit), 135 Fed. 77, 67 C. C. A. 551.

[2] A careful consideration of the record constrains us to the opinion that there was no fraud or collusion between the bank and the bankrupt for the purpose of creating a preferential transfer with respect to the deposit balance in question. It is not, and could not be, contended that there was any collusion in respect to creating this balance. If collusion existed, it must be found in the agreement between the bank and the Mercantile Company that the deposit should remain in the bank during the investigation of the solvency of the Mercantile Company, and for the purpose of permitting the bank to apply this balance upon its notes in case the Mercantile Company should turn out to be insolvent. This question must be answered in the light of existing conditions. The suggestion that the balance be not drawn upon came from the Mercantile Company's attorney, because he thought such arrangement only fair to the bank as preventing prejudice to it, through its failure to take action to protect its interests, including the possible repudiation of the credit as obtained by misrepresentation. The Mercantile Company was at the time actually insolvent. The bank had the power (as distinguished from the right) to refuse checks upon its deposit balance. If the Mercantile Company proved insolvent, or the credit turned out to have been obtained by fraudulent misrepresentations, the bank had the right to so refuse. Such refusal would naturally have tended to precipitate hostile action by the creditors of the Mercantile Company, and when the condition of the company was actually learned would naturally have brought about bankruptcy proceedings. It was, to our minds, entirely proper that the Mercantile Company should, in these circumstances, arrange for a continuance of the existing status, which, should the Mercantile Company prove solvent, would be of benefit to it, and, should it prove insolvent, would merely give the bank the same rights as it would have if then existing insolvency were recognized. The transaction in no sense amounted to a hypothecation of this balance, as suggested by appellee's counsel. The fact that the bank had reason to believe the Mercantile Company was insolvent did not affect its right to set-off. In the Massey Case a portion of the deposits held applicable by way

of set-off were made after the bank had knowledge of the debtor's insolvency. The testimony of the attorney of the Mercantile Company, in our opinion, distinctly repels the inference of an intent to give the bank a preference. We think the bank should have been allowed to offset the deposit balance of February 5th upon the bank's notes.

As to the balance of deposits made after February 5th:

If the bank held these deposits as trustee for the Mercantile Company, the right to set off the same against the latter's notes did not exist. Under the authority of Western Tie & Timber Co. v. Brown, 196 U. S. 502, 25 Sup. Ct. 339, 49 L. Ed. 571, the bank was entitled to prove its debt with the set-off in question eliminated, but remained a debtor to the bankrupt for the amount of the deposits; and if such trust relation existed, the action taken by the court in protection of the bankrupt's estate, with respect to dividends on the bank's claim, in case of the latter's failure to make payment of the trust fund, was proper, unless as regards the award of execution for balance not covered by dividends, as to which question we do not find it necessary to express an opinion.

The alleged trust relation, including the conversion recognized by the District Judge, rests upon the existence of an understanding between the bank and the Mercantile Company that the latter should be at liberty to withdraw the entire amount of its deposits made after February 5th, and that the bank should not be at liberty to set off against the Mercantile Company's notes any balance that should not be so drawn out, and that such deposits were not made in the ordinary course of business, but became in fact a special deposit. Upon a careful examination of the record, we are constrained to hold that the evidence does not warrant such conclusion. The referee has not found as a fact that there was any agreement to that effect between the parties, or even an understanding to that effect on the part of the bank. As we read the record, there is no direct testimony of any express agreement or mutual understanding to that effect. There is nothing in the testimony of the bank's attorney which, in our opinion, warrants such inference. On the other hand, the attorney for the Mercantile Company, while testifying to the statement to the bank's attorney that he would see that the Mercantile Company should not make withdrawals in excess of the new deposits, does not state that the bank was even asked to agree that all the new deposits might be checked against. The substance of the testimony of the Mercantile Company's attorney on this point is that he was anxious to have the banking relations continued without hostile steps upon the part of the bank, and that in order to induce the latter to continue such relations he agreed that the bank's status should not be impaired by an attempt on the part of the Mercantile Company to withdraw more than it should deposit. It is true that the Mercantile Company's attorney testified that his "idea was that the proposition was that the Block Mercantile Company should be absolutely free to withdraw every cent that it deposited after that date," and that "if there had been any scheme on the part of the bank, or anything that would have kept us from using the money dur-

ing this investigation, I would have had to make some other arrange-
ment and found another place to deposit," and that if he had under-
stood in his own mind that his clients could not withdraw against sub-
sequent deposits he would not have advised them to make their de-
posits in the same bank. To the definite question as to the bank's ac-
ceptance or rejection of the suggestion he replied:

"I want to say this: That Mr. Hirsh [the bank's attorney] was pressing
me for information which I did not have, and I was holding him up until I
could get it, so it looked to me like a fair proposition. Now, as to whether
that was accepted or rejected, in this way it must have been that I thought
it was going to go through. I mean by that certainly I would be permitted
to withdraw against deposits, or I never would have done it."

And again:

"I have stated repeatedly in this examination that I could not remember
what answer that Mr. Hirsh made to my suggestion, as to continuing pres-
ent deposits intact and the subsequent deposits to be withdrawn."

This testimony, in our opinion, falls short of evidencing a contract
or understanding whereby the Mercantile Company should, under any
and all circumstances, have the right to draw out all the new deposits,
or whereby the new deposits should be held in any way as a special
deposit differing from the ordinary bank deposit. The attorney of the
Mercantile Company seems not unnaturally to have assumed that so
long as the Mercantile Company was continuing to do business in the
usual way, and in advance of a development of its insolvency, checks
on the bank account would be honored. But we find no agreement or
mutual understanding to that effect. Such course was in fact taken;
for it was not until after the accounting of the Mercantile Company's
affairs was completed, showing that its financial condition was much
worse than believed by its attorney on February 5th, and suggesting
probable insolvency, and indicating that a portion at least of the credit
extended to the Mercantile Company was procured by false represen-
tations, that the bank refused to honor further checks. In our opin-
ion there was, to say the least, no room for finding an understand-
ing between the bank and the bankrupt that the bank waived its right
of set off on account of any balance that might remain after such sit-
uation was found to exist. Nor do we think that the fact that the
bankrupt's business was during the examination of its affairs being
managed by subordinates, rather than by its usual officers, changed the
nature of the deposits from the ordinary relation.

Did the application upon the bankrupt's notes of the amount of the
bank deposits made after February 5th amount to an unlawful prefer-
ence under the bankruptcy act? Neither the referee nor the judge so
found, nor are we able to so find. It is true that on and after the 5th
of February the bank had reason to believe that the Mercantile Com-
pany was insolvent. It is also true that the application upon the bank's
debt of this balance of deposits, accumulated after notice of possible
insolvency of the Mercantile Company, in fact enables the bank to ob-
tain a greater dividend on its claim than creditors generally obtained.
But, unless it was the intention of the parties to so accumulate depos-
its for the purpose of preferring the bank, the transaction did not

create a preference under the bankrupt act. This view is supported by the case of New York County Bank v. Massey, supra. As before remarked, a considerable portion of the deposits allowed as a set-off in that case was made after actual knowledge on the part of the bank of the insolvency of its customer. As said in that case, speaking of a deposit of money to one's credit in a bank:

"It is true that it creates a debt, which, if the creditor may set it off under section 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation. and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of section 68a. If this argument were to prevail, it would in cases of insolvency defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that to the extent of the set-off he is paid in full."

We not only find nothing in the record to sustain an inference that it was the intention of the parties to give a preference to the bank, but, on the other hand, the testimony of the bankrupt's attorney emphatically negatives such intention. He says:

"There was no arrangement made by which the Block Mercantile Company were to make deposits for the purpose of exceeding its withdrawals."

And again, in reply to a question whether there was any suggestion, direct or indirect, that the deposits of the Mercantile Company should be made so that the bank's debt would be paid in the event of bankruptcy, he said:

"There was no such arrangement, and there was nothing said at that time or in that conversation that even savored of such an arrangement. At that time I had no idea that there would ever be a bankruptcy proceeding."

For these reasons we are constrained to hold that there was error in not allowing the set-off as to the deposits made after February 5th, as well as the balance existing on that date. It follows, from the views we have expressed, that the order of the District Court should be reversed, with directions to allow the balance claimed in full after the application thereon, by way of set-off, of the entire amount of bankrupt's deposit balance in the bank.