### BAILEY et al. v. MERRIMACK NAT. BANK.

### In re COOPER–LIBERTY–THOMPSON CO.

(District Court, D. Massachusetts. August 30, 1922.)

#### No. 1134.

1. Bankruptcy ⬅166(3)—When bank which accepts deposit with knowledge of depositor's insolvency may apply deposit on its claim stated.

A bank, which accepts a deposit with knowledge that depositor is insolvent, may apply the deposit on its claim, unless the bank and depositor know, or as reasonable persons are bound to know, at the time the deposit is made, that the deposit in all probability will give the bank an advantage through its right of set-off, in which case the deposit and subsequent application of it amount to a recoverable preference.

2. Bankruptcy ⬅166(3)—Bank held not entitled to apply deposit to claim against bankrupt, in view of circumstances when deposit was made.

Where a corporation, unable to meet its obligations, applied to creditors for assistance and suspended business, except to collect outstanding accounts, and a creditors' committee failed to secure an extension from certain creditors, a bank, which, knowing such facts, accepted the corporation's deposit, could not apply such deposit on its claim against the corporation; but such application would amount to a recoverable preference under Bankruptcy Act (Comp. St. §§ 9585–9656), it having been apparent to the bank when the deposit was made that the efforts at reorganization had failed and the deposit probably would not be drawn out, or except in connection with the corporation's liquidation and distribution of assets.

In Equity. Suit by Hollis R. Bailey and others, trustees in bankruptcy of the Cooper-Liberty-Thompson Company, against the Merrimack National Bank. Decree for plaintiffs.

Hollis R. Bailey, of Boston, Mass., and Edward R. Hale, of Haverhill, Mass., for plaintiffs.

Hurlburt, Jones & Hall and Goldmann Edmunds, all of Boston, Mass., for defendant.

MORTON, District Judge. This is a suit by the trustees in bankruptcy of the Cooper-Liberty-Thompson Company to recover

from the defendant bank deposits made with it by the bankrupt and set off by the bank upon indebtedness due to it from the bankrupt. The facts are as follows:

The bankrupt manufactured shoes. It had a substantial factory, which was located at first in Haverhill and was later removed to Marlborough. Like many other concerns engaged in that business, it was severely affected by the extraordinary decline in prices and lack of orders which occurred during the middle and latter part of 1920. The bankrupt bought heavily of leather in the early part of 1920, and suffered disastrous losses by the shrinkage in values and lack of business. In September, 1920, some banks refused to renew its notes, and in October a meeting of its larger creditors was held. At this time the bankrupt's statement of condition, which carried its merchandise at cost, showed a surplus. Mr. Liberty and Mr. Cooper insisted at the creditors' meeting that the bankrupt was solvent and would pull out if given an extension. Mr. Thompson, who, as one of the committee of creditors, had examined the factory and tangible assets, and had inquired about the book assets, expressed the opinion at the meeting that the company was insolvent. It was decided that, if all creditors of more than $1,000 agreed, an extension of six months would be granted, the business should be operated by a creditors' committee, and the debts below $1,000 should be paid. A committee was accordingly designated and undertook to act. A circular letter stating the proposed terms of extension and the committee which would run the business was sent to creditors under date of November 1, 1920, and was assented to by the defendant on November 17th. The committee took charge of the company's affairs on or about November 1st, and continued in charge of them until about January 1, 1921. The factory was shut down after the stock in process had been run through; and the help, with the exception of a small office force, were discharged. During the latter part of November and December no manufacturing business was done.

As money came in on accounts receivable it was deposited in various banks, the defendant being one of them. All of these banks held notes of the bankrupt; all of them had been represented at the creditors' meetings, of which there were several; and all of them had assented in writing to the proposed arrangement for extension of the indebtedness. The deposits were placed by Mr. Houghton, bookkeeper of the bankrupt, at his discretion. He endeavored to make them in a general way proportionate to the amount of notes which the various banks held against the bankrupt. In October there were nine deposits made with the defendant, aggregating about $33,370, and withdrawals amounting to about $34,516; in November there were two deposits, aggregating $495, and withdrawals amounting to $568; in December there were two deposits, aggregating $3,273, and withdrawals amounting to $1,160.

On January 1st the balance was $5,159.01, which on January 3d was set off by the defendant upon notes of the bankrupt which it held. It is this application which the trustees now claim was unpermissible, and which they seek to set aside as being a preference. The pro-

posed agreement of extension did not become effective; and it does not appear that the deposits here in question were received under an express agreement that they should not be applied against indebtedness of the bankrupt, although I think it should be added that undoubtedly everybody interested assumed that no such application would be made, and that the defendant's action, whether legal or not, was certainly lacking in good faith. In the latter part of December, 1920, or the first part of January, 1921, the creditors' committee ceased to function, and the control of the business was again assumed by the company's officers, who had been superseded by the committee.

[1] The law applicable to these facts is well settled. Although a depositor may be insolvent, and may be known by the bank to be insolvent at the time when a deposit is made, the bank is still entitled to apply the deposit on its claim. It is only when affairs have reached such a point that both parties to the deposit know, or as reasonable persons are bound to know, that the effect of making it will in all probability be to give the bank an advantage through its right of set-off, that the deposit and the subsequent application of it amount to a recoverable preference. In other words, if the natural and probable consequence of making a deposit, as evident to the bank at the time when it is made, will be to give a preferential advantage to the bank, the right of application is lost as to such deposits. Newport Bank v. Herkimer Bank, 225 U. S. 178, 184, 32 Sup. Ct. 633, 56 L. Ed. 1042; Studley, Tr., v. Boylston National Bank, 229 U. S. 523, 33 Sup. Ct. 806, 57 L. Ed. 1313; Mechanics' Bank v. Ernst, 231 U. S. 60, 34 Sup. Ct. 22, 58 L. Ed. 121; In re Fairburn Oil Fertilizer Co. (D. C.) 240 Fed. 835; First National Bank v. Harper, 254 Fed. 641, 166 C. C. A. 139. It is not now essential that there should be an intent to prefer by the depositor. Decisions made under the Bankruptcy Act before the amendment of 1910 (see Comp. St. §§ 9585–9656) may not be applicable. Collier on Bankruptcy (12th Ed.) pp. 865, 866.

Up to a certain date it was still uncertain what the outcome of the company's difficulties would be, whether it would be wound up, or whether by composition or extension it would succeed in continuing. Just when it became apparent that the company was so hopelessly insolvent that it could not go on, and would have to be liquidated, is not entirely clear. That point had certainly been reached at the creditors' meeting held on December 22, 1920. One of the bank men on the creditors' committee recommended at that time the acceptance of an offer for the plant and materials which would have resulted in the creditors realizing only about 30 per cent. on their claims. At this meeting, while there was objection to accepting the price offered for the property, everybody seems to have assumed that it was only a question of price, and that if a reasonable amount could be obtained the company's property would be sold. There is no suggestion in the evidence that at that meeting there was any expression of belief by creditors that the company was still solvent, or any discussion of ways and means for the company to continue. I am unable to see what step could have been reasonably anticipated by the parties interested at that time, except forced liquidation by bankruptcy or re-

ceivership proceedings. The company had been unable to meet its obligations, and had applied to its creditors for assistance; a creditors' committee had taken charge of its affairs, and efforts had been made to secure an extension; those efforts had failed, and the creditors' committee was about to give up the task; and a few days later the business was turned back into the hands of its original managers, certainly in no better condition and probably in a decidedly worse one— because prices had been declining all the time—than when it was taken over by the committee. There was nothing left but winding up. Mr. Arnold, president of the defendant, denies that he then believed the company insolvent and unable to continue. He was familiar with the company's situation as above described. Several weeks before he had requested Mr. Thompson to have the Haverhill Trust Company institute receivership or bankruptcy proceedings, expressing in substance the opinion that the company ought to be wound up. The exact date of this conversation is not fixed, but it was early in December. In view of the facts which had come to his attention and of this conversation, Mr. Arnold is clearly mistaken in asserting his belief that the company was solvent and could probably go on at that time; he knew that it was not, and could not.

[2] The last deposit made with the defendant was on December 10th, $3,186.88. During November and December there had been no deposits in the regular course of business; the company had suspended business, except to get in its outstanding accounts and keep a small office force. It was paying no bills, except such as that required. These facts, too, were known to Mr. Arnold. I think it was obvious to him, when this deposit was made, that it would not be drawn out, aside from such small amounts as might be needed for the purposes stated, except in connection with the liquidation of this insolvent company and the distribution of its assets; and I so find. I therefore find and rule that the defendant had no right of set-off as to this deposit, and that it must be returned to the trustees. I think that the same situation existed on December 7th; and I so find. The deposit made on that day must be returned.

The next previous deposit was on November 4th. At that time I do not think that the situation had sufficiently developed to make it obvious that the company could not continue and would have to be liquidated; and I find accordingly.

It follows that the plaintiffs are entitled to a decree for the repayment of the deposits of December 7th and 10th, amounting to $3,273.-83, with interest from date of demand.

So ordered.