CITIZENS' NAT. BANK OF GASTONIA, N. C., v. LINEBERGER.

In re KIRBY–WARREN CO.

No. 3017.

Circuit Court of Appeals, Fourth Circuit.
Nov. 17, 1930.

E. T. Cansler, of Charlotte, N. C. (A. C. Jones, of Gastonia, N. C., and Cansler & Cansler, E. T. Cansler, Sr., and M. C. Moysey, all of Charlotte, N. C., on the brief), for appellant.

P. W. Garland, of Gastonia, N. C., and Charles W. Tillett, Jr., of Charlotte, N. C. (Tillett, Tillett & Kennedy, of Charlotte, N. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and GRONER, District Judge.

PARKER, Circuit Judge.

This is an appeal in an action at law instituted by the trustee in bankruptcy of the Kirby-Warren Company to recover alleged preferences given to the Citizens' National Bank of Gastonia, N. C. The learned trial judge directed a verdict in favor of the trustee, and from judgment thereon the bank has appealed.

The Kirby-Warren Company, a mercantile corporation of Gastonia, N. C., in March, 1927, found itself in financial difficulties and unable to pay its creditors. It was indebted to the Citizens' National Bank of Gastonia in the sum of $14,700, represented by notes of the following amounts and maturities: $4,500, March 10th; $1,500, March 16th; $5,500, April 8th; $600, April 14th; and $2,600, April 15th. All of these were indorsed

524

by M. F. Kirby, Jr., and W. Y. Warren, officers of the corporation and owners of its stock, who were solvent. The total liabilities of the company were in excess of $52,000. Its assets consisted of a stock of merchandise, fixtures, accounts, etc., valued in a financial statement of February 1st at $61,723.73, but by appraisers in bankruptcy on April 5th at $22,809, and sold by the trustee a short while afterwards for $19,977.

There is no evidence that the bank had any notice of the financial difficulties of the company until the night of Saturday, March 12th. On that night, Kirby and Warren met the president of the bank and their attorney at the office of the bank, and went over the company's affairs for the purpose of determining what was to be done to meet the pressing claims of creditors. They had before them the financial statement of February 1st, showing the assets of the company to be $61,723.73 and its liabilities, exclusive of capital stock, to be $44,649.43. All present at the meeting testify that they considered the corporation solvent at that time; but it was decided, nevertheless, to submit an offer in compromise to mercantile creditors of 25 per cent. of their claims. On March 15th the attorney of the company, in accordance with this decision, wrote a letter to such creditors making this offer, calling a meeting for March 24th to consider same and stating that, at a forced sale, the stock and fixtures of the company would not bring over 33⅓ per cent., its accounts not over 25 per cent., and that insolvency proceedings would probably result in a dividend of less than 25 per cent.

The testimony is that the president of the bank was called into the conference because he was a brother-in-law of Kirby, and not because of his connection with the bank, and that he took no part in advising with regard to the sending of the letter; but it is clear that he was informed as to the condition of the company and knew that a letter proposing the compromise was to be sent. This letter contained a statement to the effect that pending the meeting of creditors the assets of the company would be fully protected and preserved in the interest of all creditors, and that any effort on the part of a creditor to obtain any preference by legal proceedings, or otherwise, would result immediately in insolvency proceedings. The attorney who sent the letter was a director of the bank and a member of its finance committee; but he sent it not as representing the bank but as representing the company, and it is not shown that the president or any other officer of the bank

saw the letter or knew that it contained this statement.

On Monday, the 14th, following the meeting on the night of Saturday the 12th, the bank collected $2,100 on the note of $4,500 which fell due on the 10th, and took a renewal note for $2,400 due May 9th. The $2,100 included what was approximately the balance which the company had on deposit at the close of business on the 12th, the exact balance being $611.15, and a payment of $1,500 which Kirby made under the following circumstances: Kirby owed the company $1,500. He applied to the bank for a loan to pay this; and the bank agreed to make him the loan, but only on condition that the proceeds thereof be applied on the company's note to the bank. He accepted this condition and gave the bank his note for $1,500, secured by collateral. The proceeds of the loan were deposited to the credit of the company, and the company's check was given to the bank for the sum of $2,132, the $32 being for interest.

Following this transaction, the company continued in business until April 1st, moneys taken in by it being deposited in the bank from day to day in regular course of business in an account subject to check. In addition to the check for $2,132, to which we have referred, 27 checks, aggregating the sum of $1,381.76, were honored and paid by the bank, leaving a balance of $3,486.32. Except in the case of one postdated check given prior to March 12th, some outstanding checks which had previously been dishonored, and some checks given for merchandise shipped C. O. D., none of the checks represented payments made to mercantile creditors. On the sending out of the letter, the attorney advised the company to make no further payments to mercantile creditors; but it is not shown that any officer of the bank had notice of this advice. The deposits during the month of March were only slightly larger than during the month of February, considerably less than during the month of January, and practically the same as the deposits of March of the preceding year. The daily balance was larger than during the month of February and the latter half of January, but not larger than during the month of December and the first half of January. There is no evidence of any agreement that the deposits should be made to extinguish indebtedness due the bank, that they should be piled up as security against which the bank might assert its bankers' lien, that they should not be subject to withdrawal at the will of

the depositor, or that they differed in any way from ordinary deposits subject to check made in the usual course of business.

The creditors' meeting called for March 24th was postponed at the request of one of the creditors to March 28th and then to April 1st. On the latter date, upon the insistence of one of the creditors that the company be placed in the hands of a receiver, it filed a voluntary petition in bankruptcy. Thereafter the bank credited the balance on deposit on the company's notes which it held.

Under the practice prevailing in North Carolina, issues were submitted to the jury, which, under the direction of the court, they answered as follows:

"1. Was Kirby-Warren Company insolvent from March 12, 1927 to date of adjudication of bankruptcy as alleged in the complaint? Answer: Yes.

"2. Did the defendant on or about the 14th day of March, 1927, receive a preference not allowed by law as alleged in the complaint? Answer: Yes.

"3. If so, what was the amount of such preference? Answer: $2100.00.

"4. Did the defendant, without legal right, seize funds of Kirby-Warren Company on deposit with it after the adjudication of bankruptcy? Answer: Yes.

"5. If so, in what amount? Answer: $3486.32."

The bank duly excepted to the direction given the jury as to answering the issues, prayed the direction of a verdict in its own favor, and requested a number of special instructions bearing on the law, which, in the view we take of the case, it is not necessary for us to consider.

■ On the second and third issues, which relate to the $2,100 transaction, we think there can be no question that the instruction complained of was erroneous. As heretofore stated, $600 of this amount represented funds on deposit to the credit of the company when the bank first learned of its financial difficulties. Not only was this $600 deposited in regular course of business, but there is nothing in the record to show that at the time of its deposit the bank had any reason to even question the solvency of the depositor. It held at the time a past-due note of the company for $4,500 and had the right to credit this deposit on the note, even though in the meantime it may have received notice of the company's insolvency. New York County Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199,

48 L. Ed. 380; Continental & Commercial Trust Co. v. Chicago Title Co., 229 U. S. 435, 33 S. Ct. 829, 57 L. Ed. 1268; In re Wright-Dana Hardware Co. (C. C. A. 2d) 212 F. 397. And it can make no difference that, instead of merely charging off the deposit and crediting it on the note, the same result was accomplished by accepting and crediting a check drawn against the deposit. Studley v. Boylston Bank, 229 U. S. 523, 529, 33 S. Ct. 806, 57 L. Ed. 1313; Drugan v. Crabtree (C. C. A. 4th) 299 F. 115; Murray v. Corn Exchange Bank (D. C.) 31 F.(2d) 373, affirmed (C. C. A. 2d) 31 F.(2d) 375; Jandrew v. Guaranty State Bank (C. C. A. 5th) 294 F. 530; In re Cross (C. C. A. 2d) 273 F. 39; Toof v. City Nat. Bank of Paducah, Ky. (C. C. A. 6th) 206 F. 250; Wilson v. Citizens' Trust Co. (D. C.) 233 F. 697, 699; Putnam v. U. S. Trust Co., 223 Mass. 199, 111 N. E. 969; Wrenn v. Citizens' National Bank, 96 Conn. 381, 114 A. 120, 122.

■ The $1,500 embraced in the $2,100 transaction represented a payment by Kirby, who was an indorser of the $4,500 note upon which the payment was credited. Whether this transaction be regarded as a payment by Kirby to the bank on the note which he had indorsed, with a credit for same on the debt which he owed the company, or whether it be regarded as a payment by him of his debt to the company upon condition that the proceeds be applied on the note which he had indorsed, the result is the same; for it did not withdraw from the company any asset available to general creditors. Kirby as indorser on the note was entitled to reimbursement from the company for any amount he might be called upon to pay by reason of his indorsement. If, therefore, he paid any part of the note, he was entitled to set off the amount so paid against his debt due the company or to have the account which the company held against him credited with the payment. If, on the other hand, the payment be regarded as made by him to the company, it appears that it was made upon the express condition that its proceeds be applied in partial extinguishment of an obligation, which, if he had been called upon to pay, he might have set off against the debt which he owed to the company. In re Dillon (D. C.) 100 F. 627; Walker v. Wilkinson (C. C. A. 5th) 296 F. 850. The payment by him of the $1,500, its application on the note indorsed by him, and the extinguishment of his debt to the company, therefore, were but the application by the parties of the principle of set off properly applicable in such a case.

■ Some confusion in thinking is likely to arise from failure to recognize that the debt due by Kirby to the company was different from its ordinary accounts receivable, in that, as indorser on the company's paper, he was entitled to set off against his debt due the company any amount which he might be called upon to pay by reason of his endorsement. When the company became insolvent, the transfer of an ordinary account might well have constituted a preference; but, as to Kirby, the insolvency meant that the liability on his indorsement would inevitably be enforced, and that, so far as his debt to the company was concerned, he might extinguish that by setting off against it the company's liability to him by reason of his payment as indorser. In paying the debt, therefore, in such way that the payment would be applied on the paper which he had indorsed, he withdrew from general creditors no asset which they might have reached otherwise, and the bank received nothing which might otherwise have gone to creditors. It is well settled that payments which do not diminish the estate of the bankrupt are not unlawful preferences within the meaning of the Bankruptcy Act. National Bank of Newport v. National Herkimer County Bank, 225 U. S. 178, 32 S. Ct. 633, 635, 56 L. Ed. 1042; Continental & Commercial Trust Co. v. Chicago Title & Trust Co., supra, 229 U. S. 435, 33 S. Ct. 829, 831, 57 L. Ed. 1268; Walker v. Wilkinson, supra; Hough v. Atchison, T. & S. F. R. Co. (C. C. A. 10th) 34 F.(2d) 238, 240; Root Mfg. Co. v. Johnson (C. C. A. 7th) 219 F. 397; In re Sagor (C. C. A. 2d) 121 F. 658; In re Dickson (C. C. A. 1st) 111 F. 726, 55 L. R. A. 349.

The case of National Bank of Newport v. National Herkimer County Bank, supra, is in point. In that case suit was brought by the trustee in bankruptcy of the Newport Knitting Company to recover from the Herkimer County Bank an alleged preferential payment. This payment had been made by the Titus Sheard Company, which had indorsed paper of the knitting company and discounted it with the bank. The Titus Sheard Company was indebted to the knitting company and, upon the insolvency of the latter, it took up the paper which it had indorsed and discounted with the bank, and set it off against its debt to the knitting company. It will be noted that in this case, as in the case at bar, payment was made by the indorser and the amount paid was set off against a debt due by the indorser to the bankrupt. In holding that this did not constitute a preference, the court,

speaking through Mr. Justice Hughes, laid down the rule which we think is applicable here. Said he:

"It is not the mere form or method of the transaction that the act condemns, but the appropriation by the insolvent debtor of a portion of his property to the payment of a creditor's claim, so that thereby the estate is depleted and the creditor obtains an advantage over other creditors. The 'accounts receivable' of the debtor, that is, the amounts owing to him on open account, are, of course, as susceptible of preferential disposition as other property; and if an insolvent debtor arranges to pay a favored creditor through the disposition of such an account, to the depletion of his estate, it must be regarded as equally a preference, whether he procures the payment to be made on his behalf by the debtor in the account, the same to constitute a payment in whole or part of the latter's debt, or he collects the amount and pays it over to his creditor directly. This implies that, in the former case, the debtor in the account, for the purpose of the preferential payment, is acting as the representative of the insolvent, and is simply complying with the directions of the latter in paying the money to his creditor.

"But, unless the creditor takes by virtue of a disposition by the insolvent debtor of his property for the creditor's benefit, *so that the estate of the debtor is thereby diminished*, the creditor cannot be charged with receiving a preference by transfer. Western Tie & Timber Co. v. Brown, 196 U. S. 502, 509, 25 S. Ct. 339, 49 L. Ed. 571, 574; Rector v. City Deposit Bank, 200 U. S. 405, 419, 26 S. Ct. 289, 50 L. Ed. 527, 532. 'These transfers of property, amounting to preferences, contemplate the parting with the bankrupt's property for the benefit of the creditor, *and the consequent diminution of the bankrupt's estate*.' N. Y. County Bank v. Massey, 192 U. S. 138, 147, 24 S. Ct. 199, 48 L. Ed. 380, 384." (Italics ours.)

In Continental & Commercial Trust Co. v. Chicago Title & Trust Co., supra, it appeared that what is known as brokers' certificates, i. e., certificates of deposit issued by a bank in special form for deposit as margin on purchases of stock, had been issued by the trust company to one Prince. Upon Prince's becoming insolvent, his rights under certain contracts were taken over by another broker, the certificates issued in connection therewith having no value to his estate under the condition of the market then prevailing. The broker handled the contracts in such manner

as to recover the certificates which had been deposited in connection therewith, and the trust company set off against its liability under the certificates the debt which Prince owed it. On suit by Prince's trustee, it was held that this did not constitute a preference, since the estate of Prince had lost nothing by the transaction by which the trust company had benefited. The court, speaking through Mr. Justice Day, said:

"This case must be dealt with in the light of certain principles, established by decisions of this court, in determining the applicable provisions of the bankruptcy act. To constitute a preferential transfer within the meaning of the bankruptcy act there must be a parting with the bankrupt's property for the benefit of the creditor, and a consequent diminution of the bankrupt's estate. New York County National Bank v. Massey, 192 U. S. 138, 147, 24 S. Ct. 199, 48 L. Ed. 380, 384; Newport Bank v. Herkimer Bank, 225 U. S. 178, 184, 32 S. Ct. 633, 56 L. Ed. 1042, 1046. * * * The statement of facts already made shows that these certificates were payable to Prince, unless they were required to be paid to the party holding them as security for Prince's dealings upon the Board of Trade. It is further evident from the facts stated that without the co-operation of Anderson & Company, who took the place of Prince upon the Board of Trade, substituted their securities for those of Prince, and carried out his obligations, the certificates would have had no value to the estate. By the arrangement made, Anderson & Company took hold of the situation, and, carrying out the deals upon which Prince was bound, cleared the certificates of any obligation to others, and they thereby became payable to Prince. What was done did not in fact diminish the estate of Prince, otherwise available to the creditors in the bankruptcy administration, for the traders holding them would have had the benefit of the deposits under the terms of the certificates and the rules of the Board of Trade. It therefore appears that this essential element of a preferential transfer within the meaning of the bankruptcy act—diminution of the bankrupt estate—is wanting. The fact that what was done worked to the benefit of the creditor, and in a sense gave him a preference, is not enough, unless the estate of the bankrupt was thereby diminished. New York County National Bank v. Massey, supra."

Coming, then, to the question involved in the fourth and fifth issues, the right of the bank to apply the deposit balance of the company on its notes, we think that the learned trial judge was in error in directing the jury to answer these issues in favor of the trustee. A deposit balance is nothing more than a debt owing by the bank to the depositor; and the right to set off such debt against a debt owing by the bankrupt is expressly given by section 68a of the Bankruptcy Act, 11 USCA § 108(a) which provides:

"(a) In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

[5] The trustee contends that the deposits in the bank, which resulted in the balance, were preferential transfers within the prohibition of section 60a of the Bankruptcy Act, 11 US CA § 96(a), which provides:

"(a) A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer of any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

An ordinary deposit in a bank, however, is not a "transfer" within the meaning of this section. Section 1(25) of the Bankruptcy Act, 11 USCA § 1(25), defines the word transfer as used in the act as follows: "(25) 'transfer' shall include the sale and every other and different mode of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security." A deposit in a bank is not a sale or parting with property, or its possession, as a payment, pledge, mortgage, gift, or security. It does not deplete the estate of the depositor, but results in substituting for currency, bank notes, checks, drafts, and other bankable items a corresponding credit with the bank, which may be checked against, and which provides the depositor with the medium of exchange in universal use in the transaction of business. A deposit of funds differs from a payment in the essential particular that it is withdrawable at the will of the depositor. Of course a deposit may be made the cloak for some other transaction, such as payment or the giving of security; and in such case equity, which looks through form to substance, will treat the transaction according to

its real nature. But if the deposit is in reality a deposit, made in good faith as such, subject to the withdrawal of the depositor, and not made as a cloak for a payment or other forbidden transaction, it is not a transfer within the meaning of the Bankruptcy Act and cannot be attacked as preferential, even though it may have been made when the depositor was insolvent, and even though the bank, by applying it as a set-off, may have obtained a greater percentage on a debt which it holds against its insolvent depositor than his other creditors can obtain.

The leading case on the subject is New York County Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 200, 48 L. Ed. 380, to which we have previously referred. In that case deposits were made by the bankrupts after they had become insolvent and after a statement showing their insolvency had been furnished to the bank. After the adjudication of bankruptcy, the bank applied the deposit balance, which included these deposits, on notes which it held against the bankrupts, and proved its claim for the balance due on the notes. This application of the deposit balance was upheld by the Supreme Court against the contention that it constituted a voidable preference. What was said by the court in that case answers completely, we think, the contention of the trustee in the case at bar; and for that reason we shall quote from it at length. The court said:

"It cannot be doubted that, except under special circumstances, or where there is a statute to the contrary, a deposit of money upon general account with a bank creates the relation of debtor and creditor. The money deposited becomes a part of the general fund of the bank, to be dealt with by it as other moneys, to be lent to customers, and parted with at the will of the bank, and the right of the depositor is to have this debt repaid in whole or in part by honoring checks drawn against the deposits. It creates an ordinary debt, not a privilege or right of a fiduciary character. Bank of the Republic v. Millard, 10 Wall. 152, 19 L. Ed. 897. Or, as defined by Mr. Justice White, in the case of Davis v. Elmira Sav. Bank, 161 U. S. 288, 16 S. Ct. 505, 40 L. Ed. 702: 'The deposit of money by a customer with his banker is one of loan, with the superadded obligation that the money is to be paid, when demanded, by a check.' Scammon v. Kimball, 92 U. S. 369, 23 L. Ed. 485. It is true that the findings of fact in this case establish that at the time these deposits were made the assets of the depositors were considerably less than their liabilities, and

that they were insolvent, but there is nothing in the findings to show that the deposit created other than the ordinary relation between the bank and its depositor. The check of the depositor was honored after this deposit was made, and for aught that appears Stege Brothers might have required the amount of the entire account without objection from the bank, notwithstanding their financial condition. * * *

"As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. *It is not a transfer of property as a payment, pledge, mortgage, gift, or security.* It is true that it creates a debt, which, if the creditor may set it off under § 68, amounts to permitting a creditor of that class to obtain more from the bankrupt's estate than creditors who are not in the same situation, and do not hold any debts of the bankrupt subject to set-off. But this does not, in our opinion, operate to enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of § 68a. If this argument were to prevail, it would, in cases of insolvency, defeat the right of set-off recognized and enforced in the law, as every creditor of the bankrupt holding a claim against the estate subject to reduction to the full amount of a debt due the bankrupt receives a preference in the fact that, to the extent of the set-off, he is paid in full. * * *

"There is nothing in the findings to show fraud or collusion between the bankrupt and the bank with a view to create a preferential transfer of the bankrupt's property to the bank, *and in the absence of such showing we cannot regard the deposit as having other effect than to create a debt to the bankrupt, and not a diminution of his estate.*" (Italics ours.)

In Continental & Commercial Trust Co. v. Chicago Title Co., from which we quoted above, there was involved, not merely the brokers' certificates, but also a general deposit balance of $575.79. This deposit balance was the result of deposits made after Prince had become insolvent, after his loans had been called by the bank, and after the bank had agreed to pay certain salary and pay roll checks, if he would make deposits for the purpose. As to this, the court said:

"As to the $575.79, we think the right to

set off this deposit is established by the principles laid down in New York County Natl. Bank v. Massey, supra. Here there was a deposit subject to be checked out by the bankrupt for specific purposes. The money was not placed in the bank with a view to giving it a benefit, except indirectly, because of the deposit. It was subject to Prince's check, and all of it might have been checked out for the purposes intended."

In Studley v. Boylston Bank, 229 U. S. 523, 33 S. Ct. 806, 808, 57 L. Ed. 1313, to which we referred in discussion of the first point, it appeared that deposits were made after the bank knew of the insolvency of the depositor, that payments were made to the bank by check from these deposits, and that maturing notes were charged against them. In upholding the right of set off in such a case, the court, after remarking that the Bankruptcy Act does not prevent an insolvent from continuing in trade, depositing money in bank, drawing checks and paying debts, said:

"We * * * pass to the consideration of the right of set-off in the light of the finding by the referee, by the district judge, and by the court of appeals, that the deposits were honestly made, in due course of business, and without any intent to prefer the bank.

"The money so deposited was the proceeds of the sale of tickets to a large party of round-the-world tourists, and was put in bank, not for the purpose of preferring it, but in the expectation of being used for carrying on the business in the future as in the past. Indeed, the payments were made with the statement that the company would expect the bank to discount other notes. We find nothing in the record to indicate that the deposits were made for the purpose of enabling the bank to secure a preference by the exercise of the right of set-off. The case, therefore, comes directly within the decision in New York County Natl. Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380, where $3,884 deposited by an insolvent customer, in good faith, four days before the filing of the petition against him was allowed to the bank by way of set-off on notes of the bankrupt held by it. * * *

"The bankruptcy act recognizes this right, and it cannot be taken away by construction because of the possibility that it may be abused. The remedy against that evil is found in the fact that the trustee is authorized to sue and recover if it is shown that after insolvency the money was deposited for the purpose of enabling a bank or other creditor to secure a preference. But to deny the right of set-off in cases like this, would in many cases make banks hesitate to honor checks given to third persons, would precipitate bankruptcy, and so interfere with the course of business as to produce evils of serious and far-reaching consequence."

These decisions of the Supreme Court have never been overruled or questioned. On the contrary, they have been accepted as defining the rights of banks with respect to the deposits of insolvents, and the principles laid down by them have been followed and applied in a long line of cases, among which are Drugan v. Crabtree (C. C. A. 4th) 299 F. 115; Rupp v. Commerce Guardian Trust & Savings Bank (C. C. A. 6th) 32 F.(2d) 234; Murray v. Corn Exchange Bank (D. C.) 31 F. (2d) 373; Id. (C. C. A. 2d) 31 F.(2d) 375; Ingram v. Bank of Cottage Grove (C. C. A. 9th) 29 F.(2d) 86; American Bank & Trust Co. v. Morris (C. C. A. 5th) 16 F.(2d) 845; In re Cross (C. C. A. 2d) 273 F. 39; Fourth Nat. Bank of Wichita v. Smith (C. C. A. 8th) 240 F. 19; German-American State Bank v. Larimer (C. C. A. 8th) 235 F. 501; In re Wright-Dana Hardware Co. (C. C. A. 2d) 212 F. 397; Germania Savings Bank v. Loeb (C. C. A. 6th) 188 F. 285; In re George M. Hill Co. (C. C. A. 7th) 130 F. 315, 66 L. R. A. 68.

Of course, where deposits are not made in the regular course of business, as where they are made fraudulently and collusively for the purpose of giving the bank a preference, or where they are not in reality deposits at all, but are payments, the right of set-off does not exist, and they may be recovered as preferential. Thus in Union Trust Co. v. Peck (C. C. A. 4th) 16 F.(2d) 986, reported below as In re Almond-Jones Co., 13 F.(2d) 152, the deposits were not made in the ordinary course of business, but were made to build up the account so that it might be applied in payment of the bank's claim. See 13 F.(2d) at pages 156 and 157. In Blue v. Herkimer National Bank (C. C. A. 2d) 30 F.(2d) 256, it appeared that moneys were collected and deposited for the purpose of being applied on the maturing notes of the bankrupt. In Kollman v. Manufacturers' Trust Co. (C. C. A. 2d) 27 F.(2d) 659, it appeared that the deposits were made by the bankrupt in order that the bank, by exercising its right of set-off, might obtain a preferential payment. In Elliotte v. American Savings Bank (C. C. A. 6th) 18 F.(2d) 460; First Nat. Bank of El Centro v. Harper (C. C. A. 9th) 254 F. 641; and In re Kellar (D.

C.) 110 F. 348, deposits were applied in payment of overdrafts, and it was held that they were not deposits in ordinary course subject to check, but were in reality payments on pre-existing debts. In Mechanics' & Metals' Nat. Bank v. Ernst, 231 U. S. 60, 34 S. Ct. 22, 58 L. Ed. 121, deposit was made after the officers of the bank had forbidden payment of depositor's checks; and it was held that for this reason the deposit was in reality a payment, not a deposit in ordinary course. In Rupp v. Commerce Guardian Trust & Savings Bank (C. C. A. 6th) 32 F.(2d) 234, the account of the depositor had been closed and the deposits in question were accepted for application on the indebtedness of depositor and were held to be mere payments. In Bank of California v. Brainard (C. C. A. 9th) 3 F.(2d) 3, bankrupt deposited checks for collection, was given immediate credit for same, and drew a check against the deposit in payment of a note due the bank; and it was held that this was evidence for the jury that the transaction was in reality a preferential payment and not a deposit. In Merrimack Nat. Bank v. Bailey (C. C. A. 1st) 289 F. 468; Id. (D. C.) 283 F. 514, the deposits were not made in regular course of business, but after the factory of bankrupt had been closed and the creditors' committee, on which the bank was represented, had taken over the business, following an agreement of all creditors for a six months' extension of credit. In Gates v. First Nat. Bank of Richmond (D. C.) 1 F.(2d) 820, the deposits were made after suspension of operations by the bankrupt company and while its affairs were being investigated by a creditors' committee of which the vice president of the bank was a member. In Union Bank & Trust Co. v. Loble (C. C. A. 9th) 20 F. (2d) 124; Id. (D. C.) 14 F.(2d) 116, the deposits made were proceeds of a special sale, held on the advice of the bank, to raise funds for Eastern creditors. It was held that the circumstances under which this fund was created and the co-operation of the bank and the bankrupt in its creation so far impressed it with a trust as to estop the bank from asserting its right of set-off.

An examination of the cases cited in the preceding paragraph will disclose the principles upon which the bank's right to a set-off has been denied. In every case it will be found that the deposits were made for the purpose and as a means of effecting payment to the bank, or that they were not deposits made in the ordinary course of business and subject to withdrawal by the depositor, as where the bankrupt had suspended business and the deposits were being made from collections under the supervision of a creditors' committee, or that there was some other circumstance that stripped them of the characteristics of deposits made in ordinary course, as where the bank had instructed that checks drawn by the depositor should not be honored. There are none of these circumstances surrounding the deposits here. There is no evidence whatever of any agreement or understanding between the officers of the bankrupt company and the bank that deposits were to be piled up for the payment or security of the bank. There is no evidence that they were not to be withdrawn at any time that the company saw fit to check against them. Its checks against them, as a matter of fact, were paid; and there is nothing upon which to base even an inference that a check withdrawing the entire deposit would not have been honored up until the very day of the filing of the petition in bankruptcy. The company had not suspended its business, but was doing business in the usual way, and was depositing the proceeds of sales and collections in accordance with its usual custom.

█ It is true that the bank had notice that the company was in financial difficulties and that it was making an offer of compromise to its creditors, but we do not think that this affected the nature of the deposits or precluded the bank from applying the deposit balance against the notes which it held. We have already seen that the bank's knowledge of the insolvency of the depositor does not have this effect, and there is no reason in law or in logic why the added element of knowledge of the offer of compromise should do so; for such knowledge does not show collusion between the bank and the company, nor does it rob the deposit of the distinguishing characteristic of being subject to the control of the depositor and withdrawable at his will. We have been able to find no case which holds that such knowledge deprives the bank of its right to set off deposits made pending consideration of the offer; and the Circuit Courts of Appeals of at least two circuits have recently upheld the right of set off under such circumstances. Ingram v. Bank of Cottage Grove (C. C. A. 9th) 29 F.(2d) 86; Murray v. Corn Exchange Bank (D. C.) 31 F.(2d) 373, affirmed (C. C. A. 2d) 31 F.(2d) 375.

██ It is argued that the bank is precluded from setting off the deposit by reason of the statement in the letter to creditors, that, pending the creditors' meeting, the assets of

31

the company would be protected and preserved in the interest of all creditors, and that any effort on the part of any creditor to obtain a preference would result in insolvency proceedings. We do not think so. The bank was not a party to the making of that statement, and Myers, its president, is not shown to have known that it was made. It is true that bankrupt's attorney, who made it, was a director of the bank; but the bank is not chargeable with the knowledge which the attorney acquired in the transaction of the business of his clients. Bank v. Burgwyn, 110 N. C. 267, 14 S. E. 623, 17 L. R. A. 326; 7 R. C. L. 656; 3 Thompson on Corporations, §§ 1757–1759. If, however, the bank had had notice of the contents of the letter, it would have made no difference. The deposit of money in the bank in ordinary course of business was no violation of the agreement to preserve and protect the assets in the interest of all creditors, nor, as we have seen, was it a preferential transfer. If there had been collusion between the officers of the company and the bank, or other circumstance showing that the deposits were not made in ordinary course of business, the bank would have been precluded from asserting a set-off with respect to the deposits, irrespective of the letter; in the absence of such circumstances, the promise of the letter was not violated.

We have carefully considered the trust fund theories urged by the learned counsel for the trustee, but we do not think that they are applicable. If the letter to creditors had promised that moneys collected should be kept segregated and should be deposited in a special account for the benefit of creditors, an express trust would have arisen which could have been enforced against the bank if it had had notice of the trust. The letter, however, promised merely that the assets of the company would be protected and preserved in the interest of creditors pending consideration of the offer of compromise, which falls far short of the language necessary to create a trust. As a matter of fact, it promised nothing except what the law required in the absence of promise.

It is true that the assets of an insolvent corporation which has suspended business constitute a trust fund for the benefit of its creditors; but in the case at bar the company did not suspend business until April 1st, after the deposits in question had been made, and after the right of set-off on the part of the bank had accrued. It is true, also, that under the law of North Carolina the officer of an insolvent corporation cannot prefer himself or make a transfer of the corporate assets as security for a debt to which he stands in relation of surety or indorser; but, as we have seen above, deposits in a bank in ordinary course of business, in the absence of collusion or fraud, or some showing that they were made for the purpose of giving security or effecting a preference, are not to be deemed transfers. Even though a corporation be insolvent, it does not lose the right of doing business in the ordinary way with a bank, nor does a bank in doing business with it relinquish any of its ordinary rights or remedies. If there were showing that the deposits in question were made fraudulently or collusively, as a cloak for payments to the bank or as a means of giving it security, the trustee could avoid them under the Bankruptcy Act, without resort to the trust fund doctrine, if the bank were shown to have been a party to the fraud or collusion, or to have accepted the deposits as a means of obtaining payment or security.

It is suggested that the officers of the insolvent corporation should not be allowed to benefit by the deposits made in the bank. This, however, is a matter which cannot affect the rights of the bank. If it could be shown that the officers made the deposits fraudulently, for the purpose of preferring themselves, or for the purpose of placing the assets of the corporation where they would secure its debts for which the officers were liable, the trustee in a suit against such officers could recover from them the preference which they obtained thereby. Goldman v. Cohen (C. C. A. 1st) 261 F. 672; Walker v. Wilkinson (C. C. A. 5th) 3 F.(2d) 867.

For the reasons stated, we think that, upon the evidence in the record, verdict should have been directed for the defendant; and the judgment of the court below will accordingly be reversed.

Reversed.

NORTHCOTT, Circuit Judge (dissenting).

I cannot concur in the foregoing opinion. It seems to me that the admitted circumstances of this case lead to the conclusion that there was what amounted to at least a legal fraud. The president of the appellant bank was a brother-in-law of Kirby, one of the officers of the bankrupt company. The president of the bank, together with the attorney for the bankrupt company, which attorney was also a director of the bank and a member of its finance committee, were called into

conference with the officers of the bankrupt company with regard to the financial difficulties of the bankrupt. At this conference a certain course of action was agreed on. With the knowledge of what occurred at this conference the bank is certainly chargeable. The president was present and an attorney, on its board of directors and a member of the financial committee, participated and advised.

As a result of that conference a letter was sent to all the creditors of the bankrupt, and in that letter a direct promise was made that, pending the negotiations for settlement, assets of the bankrupt company would be fully protected and preserved in the interest of all creditors. I do not see how the bank can escape being charged with knowledge of this letter, and particularly of this promise.

On the advice of the attorney, the same attorney connected with the bank as above set out, business of the bankrupt was carried on, pending settlement, and deposits made in the appellant bank, but nothing paid out, except that which was absolutely necessary to carry on the business. No payments were made to creditors. In this way the deposits in the bank grew as to balance, abnormally with regard to the business. The deposits may perhaps be said to have been made in due course, but the account in the bank certainly was not handled in due course.

The appellant bank was fully protected on all its debts owed it by the bankrupt company by indorsement of Kirby and Warren, officers of the bankrupt company, who were personally solvent. The result of the seizure of the deposits in the bank, when negotiations for a settlement failed, was undoubtedly a preference to these solvent indorsers and not to the bank. The promise made to the creditors in letter of March 15, to which promise Kirby and Warren were parties, and as to which the bank, as I see it, would necessarily be charged with knowledge, was not carried out. The result was that assets of the bankrupt company were used to pay debts for which Kirby and Warren were liable, and the assets of the bankrupt were diminished in that amount. With regard to the $1,500 payment, it seems to me that the way the transaction was handled resulted in Kirby securing payment of the amount the company owed him in full, when he should have only participated as creditor, as to the amount of his debt, and that there, as in the case of the deposit seized, the assets of the bankrupt were diminished in the sum of $1,-

500, and the transaction amounted to an illegal preference to Kirby.

For these reasons I am of the opinion that deposits made in the bank were not deposits made in the regular course of business, but were really payments made on a debt upon which Kirby and Warren, officers of the bankrupt, who, in view of all the circumstances, especially in view of the letter of March 15, stood in a trust-relationship to the creditors, were liable as indorsers. The whole transaction was apparently used as a cloak to cover what was, at least, a legal fraud, the result of which was to give a preference to the officers of the bankrupt company over the other creditors. I am of the opinion that the charge of the court below was in every respect correct, and that the judgment should be affirmed.