### GATES et al. v. FIRST NAT. BANK OF RICHMOND, VA.

(District Court, E. D. Virginia. February, 1924.)

**1. Bankruptcy ⊂⊃154—Bank may charge deposits made within four months of depositor's insolvency against debt.**

Bank which receives money for deposit in the ordinary course of business, within four months prior to depositor's insolvency, may charge deposits against indebtedness.

**2. Bankruptcy ⊂⊃159—Elements of "preference" stated.**

Payment, to be preferential, must have been made within four months prior to bankruptcy, at time when bankrupt was insolvent, and must have given creditor receiving it a larger percentage of his debt than other creditors of same class, and such creditor must have had reasonable cause to believe that such would have been its effect.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series. Preference.]

**3. Bankruptcy ⊂⊃160—Debtor held "insolvent" at time of alleged preference.**

Where debtor was in such condition that refusal of all its creditors to extend time for payment of debts would require it to suspend operations, and where creditors refused to agree to moratorium, and assets were not sufficiently marketable to pay its debts, the debtor was insolvent, within Bankruptcy Act, § 1, subd. 15 (Comp. St. § 9585), so that delivery

of deposits to bank charged by bank to indebtedness, within four months prior to bankruptcy, constituted preference.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insolvency—Insolvent.]

**4. Bankruptcy ⊂⇒166(4)—Bank held to have reasonable cause to believe that effect of taking deposits and paying debt due itself would be to effect preference.**

Where vice president of bank, who was chairman of creditors' committee, knew that debtor could not continue business unless creditors extended time for payment of debts, that creditors had not agreed to moratorium, and that debtor had suspended operations before it made deposits in bank, the bank had reasonable cause to believe, when it charged such deposits to debtor's indebtedness to bank, that effect thereof would be to give it a preference.

In Equity. Suit by Hiram T. Gates and others, trustees, against the First National Bank of Richmond, Va. Judgment for complainants.

John P. Leary and R. L. Montague, both of Richmond, Va., for complainants.

George Bryan and Roy Cabell, both of Richmond, Va., for defendant.

Bill in equity brought by complainants under the provisions of section 60b of the Bankruptcy Act (Comp. St. § 9644). The essence of the complaint is contained in section 8 of the bill, namely, that the bankrupt transferred to and deposited with the defendant, and that the defendant, with full knowledge of the insolvency of the bankrupt, received and accepted of the bankrupt on February 18, 21, and 23, 1921, deposits aggregating $7,064.33; the defendant shortly thereafter, and two days prior to the filing of the bankrupt's petition in bankruptcy and adjudication as a bankrupt, to wit, on February 26, 1921, appropriated all of said deposits and sums of money, together with certain other sums then on deposit with it and theretofore deposited by the bankrupt, to the payment of two certain past-due notes of the bankrupt for $5,000 each, "long held by said defendant, and which has become due on December 20, 1920, and one hundred and thirteen and ³³/₁₀₀ dollars ($113.33) for interest thereon, and likewise appropriated the sum of six hundred and sixty nine and ⁵/₁₀₀ dollars ($669.05) on account of the payment of another note due it by said bankrupt on December 20, 1920"—all of which said sums were charged against the bankrupt's account.

The answer of the defendant to this paragraph of the bill is as follows:

"Defendant denies the allegation of the bill that with full knowledge of the insolvent condition of the Franklin-Caro Company, or with reasonable cause to believe that it was insolvent, or that the appropriation would create a preference, it willfully and deliberately received and appropriated the several deposits mentioned. Defendant asserted its banker's lien upon these, which it was and is advised it had a legal right to do; said Franklin-Caro Company being indebted to it in a large sum in excess of the total of said balance. Defendant is advised that the several deposits made with it by the Franklin-Caro Company created an ordinary debt, and not a privilege or right of a fiduciary character, and that the amount of such deposits may therefore be set off in bankruptcy against a claim against the depositor, allowing the bank to prove for the balance. Defendant is further advised that there is nothing in the Bankruptcy Act (Comp. St. §§ 9585–9656) which deprives a bank, with which an insolvent is doing business, of the rights of any other creditor taking money without reasonable cause to believe that a preference will result from the payment, and that said act does not prevent him from estimating in trade, depositing money in bank, drawing checks, and paying debts as they mature, either to his own bank or to any other creditor. It was this right of set-off or lien of which defendant availed itself, and which, under a correct construction of the Bankruptcy Act and the facts hereinbefore recited, it is advised that it was justified in asserting."

"Defendant further denies the allegation of said eighth paragraph of said bill that, as soon as said deposits were made, defendant refused to honor checks drawn on them or any of them, except in a few rare instances and under very urgent circumstances. On the contrary, all checks against said Franklin-Caro Company's accounts were paid by defendant *as presented* until February 26, 1921, and others were even paid on February 26, 1921. Defendant is advised and avers that these facts of themselves justify the rejection of the theory upon which the bill of complaint is predicated, namely, the knowledge by defendant or reasonable cause to believe that Franklin-Caro Company was hopelessly insolvent when said deposits were received and the said right of offset or lien attached."

GRONER, District Judge (from the bench). I do not want counsel on either side to feel that there has been a failure of investigation on my part before announcing my conclusion, but really there is not anything novel to me in any of the propositions which have been advanced in this case; however,

I have heard the fullest sort of argument and the citation of cases, with all of which I think I am more or less familiar, and, unless I have misconceived the present state of the law, I am just about as well prepared to announce my conclusions now as I will be at any later time and on further investigation.

[1, 2] The basic principles which control the determination of a question of this kind, and as applied to a bank equally as to an ordinary creditor, as I understand it, are not disputed by either side. It is well understood by counsel on both sides what those tests are. The only way in which a bank may be said to differ from an ordinary creditor is that, if a bank—a depository—receives a creditor's money for deposit to his account in the ordinary course of business, the fact that the depositor subsequently, and within four months, turns out to be insolvent, does not at all affect the bank's rights to charge, at a later time, perhaps, the deposit against the then existing indebtedness. But the act itself, which makes a preference recoverable by a trustee in bankruptcy, as I stated perhaps crudely, but, I think, more or less accurately, during the trial, is made to depend upon four things: First, there must have been a payment within four months of bankruptcy; this is the line of demarcation. It does not make any difference how insolvent a man may have been; or how clearly the intention to create a preference, it must have been within four months. If, within the four months period, a bankrupt at the time of the transfer is insolvent, which is a condition precedent, and the effect of the payment is to create what is called a preference, or to give the creditor receiving it a larger percentage of his debt than other creditors of the same class, and if at the time of the transfer the creditor receiving it has reasonable cause to believe that the effect of the payment is to cause him to receive this preference, then it is recoverable by the trustee in bankruptcy.

[3, 4] Now, applying those tests to this case, there is not any doubt about the fact that the payment complained of was made within the four months period. There is not any doubt about the fact that the effect was to give this particular creditor, as to this particular debt, a better percentage than any other creditor of like class. There are only two questions, therefore, to be determined: Whether the company was insolvent at the time of the transfer; and, if it was, whether the bank had reasonable cause to believe that the effect of taking the money

and paying the debt due itself would be to give it a preference—whether it had reasonable cause to believe that there was insolvency at that time, and that result would occur; that is, the bank would get a larger percentage. Now, if we were trying this case with a jury, I would, of course, submit those two questions of fact to the jury. However, inasmuch as it is, by request of and agreement between the parties, being tried by the court, it becomes my duty to decide those questions in view of the evidence. The Bankruptcy Law, as I recall it (subdivision 15, § 1 [Comp. St. § 9585]), gives the definition of an insolvent as: "A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

In the light of subsequent events, it is perfectly apparent that there were not enough assets to pay the creditors in this case. The suggestion has been made, very properly made, I suppose, that the character of the assets was such as to make them of no general use, and that they were valuable only to a going concern—material stamped with the name of the company, and for this particular business, rather than capable of being used by other people engaged in business generally. Still I think it perfectly clear that there was a general recognition of the fact that the company's condition was precarious; that it could not continue to operate unless its creditors forbore to exact the right of payment, which was their right, for a very long period of time, originally for a year, and subsequently, and upon further investigation, for a period of four years; that the conditions of the times, and its demands, and generally the situation in which it found itself, gave its board of directors reason to believe that the indulgence of creditors, by moratorium, I believe it is called by the banking people, you people know more about that than I do, and that only in that way, could the life of the company be prolonged. That was the situation. In other words, if it had to liquidate, it did not have sufficient assets—its assets were of a character that were not sufficiently marketable—to pay its debts; and the principal witness for the bank, the gentleman who testified last, I do not recall his name, said that he understood that; that

he was chairman of the committee when the creditors were convened originally, and at his suggestion the vice president was made a member, and that he thoroughly understood that the company could not function unless this indulgence on the part of creditors was obtained, and, in the event of the other alternative, bankruptcy, it would prove to be thoroughly insolvent. I asked him myself that question—if the company were forced into bankruptcy, would it be in a position to deny bankruptcy, by asserting solvency? and he said clearly he had no such idea, that the only way to save it was to keep out of bankruptcy, by the methods suggested. So that, assuming there was a basis for and justification of a belief on the part of the board of directors and assenting creditors that the company might be continued indefinitely, and its existing debts paid if its life were prolonged, and the claims extended for a longer period, there still was universal recognition that otherwise the company was insolvent and hopelessly involved.

Now, if these payments had been made at that time, that is to say, when the first suggestion for an extension was made, there would be, it seems to me, very proper grounds for saying that, with a large proportion of the creditors convening and agreeing to an extension, with the report of auditors showing a surplus of assets over liabilities, and with the influence which one creditor could possibly exert against another, a creditor then receiving payment might not have been charged with knowledge of insolvency. I say, again, that if payments were made, or applied, at this time, when the condition of affairs was looked into and when the company believed that by continuing business it would prove to be not insolvent, then it would be a serious question whether these payments could be said to be made with knowledge, or reasonable cause to believe, that the company was insolvent. But that is not what did occur. At subsequent meetings, one, I believe, around the 10th or 11th of February, and another on the 17th of February, the bank was made fully cognizant of what was happening,— efforts being made to get the assent of the creditors, and three of the largest creditors having declined. What their reasons were for declining, so far as the evidence shows, was not disclosed, except some intimation that another company making similar products might have had some interest in or influence with them. But that there was any real hope of succeeding with the extension plan, or that there was not more reasonable ground to believe that they could not be persuaded at the meeting of the 17th, I think is an inevitable conclusion. So that when, at the meeting, it was solemnly resolved by the board of directors, on the 17th of February, that they would prolong this last gasp for life until the 25th of February in the hope that something might happen by which these creditors would be induced to come in, but, if not, they would declare bankruptcy—I say that, after that resolution was adopted, a man who was, himself, a member of the committee, and thoroughly informed as to the situation regarding negotiations between nonassenting creditors and the bankrupt, could accept the payment of his account—say not a bank, just an ordinary creditor—and say he has no reasonable cause to believe it insolvent, it seems to me going very much further than any other case on the facts.

It seems to me, rather, to be perfectly apparent that, in the very nature of things, on February 17th, when this final resolution was adopted, they said: "We have done everything we could, made every effort we could, but have been unsuccessful. We will prolong the time for a week. At the end of that time, if nothing is in sight, we will go into bankruptcy." To say that in the interim one creditor, with full knowledge of this condition, could accept payment of its debt, and say that it was done without any reasonable cause to believe it would give it a preference, I say is a statement of facts, under the circumstances, that I cannot bring myself to assent to. The actual transfer of money was made, I believe, on the 26th. Whether the dates of the deposits, which were on the 18th, 21st, and 22d, if I recall correctly, should be the criterion, or whether the 26th, I have some doubt. But it seems to me in either event I must come to the same conclusion. Of course, if the 26th, there is not any argument. The receipt of money at that time was with unmistakable knowledge of bankruptcy. It seems to me, though, that on the 18th, 20th, 21st, or 22d conditions were so nearly similar, the imminency of the bankruptcy was so apparent to any reasonably fair-minded business man, as to charge him with complete knowledge—certainly with such knowledge as is required under the terms of the law—of the effect of what was then being done. The company was not, it is true, being operated by its creditors' committee; therefore the deposits in the bank were made by the company itself, rather than as in the Merrimac Case. But the deposits were after the suspension

of operations, and the bank knew this. So I do not think the deposits were made in the ordinary course of business; but, if in due course, I think the bank knew of the practical impossibility of keeping it out of bankruptcy, which fact was well known to everybody. It seems to me, therefore, under the circumstances, that the trustees are entitled to judgment, and I think interest should run from the time the referee declared the first dividend.

A decree will be entered accordingly.