## UPDIKE et al. v. OAKLAND MOTOR CAR CO.

### No. 250.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1931.

Jonas & Neuburger, of New York City (David Haar and Murray L. Jacobs, both of New York City, of counsel), for appellants.

Henry M. Hogan, of New York City (Albert M. Levert and John Thomas Smith, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The decree from which this appeal has been taken was rendered in a suit by the trustees in bankruptcy of H. L. Stratton, Inc., to recover preferences alleged to have been received by Oakland Motor Car Company from H. L. Stratton, Inc., at a time when the Oakland Company had reasonable cause to believe that the Stratton Company was insolvent and that an unlawful preference would be effected. The transfers were made within four months of the voluntary adjudication in bankruptcy of Stratton Company, which occurred December 30, 1926. The District Court held that Stratton Company was solvent at the times when the transfers were made and that in any event Oakland Company had no reason to suppose that this was not the case. It accordingly dismissed the bill.

Stratton Company was a dealer in automobiles under a contract with Oakland Company as seller. The latter engaged to sell motor cars and accessories to Stratton as its exclusive dealer in a certain territory in which Stratton operated many agencies. The method of handling the sale of cars under the above contract was somewhat complicated, but requires no particular consideration here. Stratton ordinarily purchased the cars by making a 10 per cent. deposit on account of the purchase price and giving a trust receipt to the General Motors Acceptance Corporation to secure notes for the balance of the purchase money. In 1926, Stratton did a large and greatly increased business, making sales of cars and accessories in the first ten months of the year to the extent of nearly $4,000,000. This business was especially active in July and August, but in September there was a serious recession which caused Stratton to apprehend that it would be without adequate capital to go through the slack fall and winter season and be ready for the spring business. Accordingly, in November, 1926, the president, Mr. Stratton, requested Oakland to take over such portion of the stock of cars as seemed to be unduly large in view of the poor business outlook. Any unnecessary stock, of course, increased the amount of interest Stratton had to pay on its notes given for the purchase of cars and secured by trust receipts and also tied up capital invested in cars which it had entirely paid for. Stratton requested Oakland to take over these surplus cars, whether owned outright or held on trust receipts, and to pay it for the cars which it completely owned and also for what is described as the "equity" in the others. Oakland did this. It took over the cars owned by Stratton at the dates, in the numbers and stipulated values below:

1926
Nov. 18, 64 cars at...$44,798.37
Nov. 30, 69 cars at... 52,304.79
                                   $97,103.16

Oakland took over the following cars upon which 10 per cent. of the purchase price had been deposited by paying off General Motors Acceptance Corporation which held notes secured by trust receipts for the remainder, and purchased Stratton's equity by crediting the latter with the amount thereof on its books:

1926
Nov. 18, 139 cars at..$12,553.43
Nov. 30, 23 cars at... 1,783.05
                                   14,336.48

Total ................. $111,439.64

The foregoing amounts due from Oakland to Stratton for the purchase of cars and equities in cars were paid by a check from Oakland to Stratton for $50,000 dated December 1, 1926. This left a balance in connection with the foregoing transactions amounting to $61,439.64. Oakland paid that balance by crediting Stratton therewith on its books and setting off these credits against a greater indebtedness to Oakland.

Thirty-two other cars were held on trust receipts by General Motors Acceptance Corporation. These cars were taken back by it on December 22, 1926, and apparently purchased from it thereafter by Oakland. On December 22, 1926, the latter credited Stratton on its books with the equity in the cars amounting to $2,242.26 and offset this sum against the indebtedness of Stratton.

The questions are mainly of fact. We are asked to find that Oakland had reasonable cause to believe that a preference would be effected when the foregoing transfers were made. Of course, no such problem arises unless Stratton was insolvent at the time, and the trial judge has held that Stratton was solvent both in November and December. We think that this was true at the earlier date.

If we take the financial statement of November 30, 1926, and omit the good will as an asset and the capital stock as a liability, there is a balance of assets over liabilities amounting to $276,937.13. We will reduce

"Charge Accounts Customers," as the trial judge did, by $28,433.92. We will exclude the items, "Due from Finance Companies," "Pay Roll Advance," "Accrued Shop Labor," "Rebate and Disability Insurance," "Additional Discount," "Rent Prepaid," "Interest and G. M. A. C. Finance Charges," "Advertising" and "Building Improvements." Some of these items, such as the prepaid ones, would seem to be allowable, and some of the others were not altogether valueless. We may also reduce the valuations of "Notes Receivable" from $6,479.51 to $221, as the trial judge did. These various deductions would lower the statement of assets by about $116,-630.89.

■ It is claimed that the valuations for Oakland, Pontiac & Co. cars, carried in the statement at $173,773.12, were too high. They appear in the statement at cost, which was 27 per cent. or 28 per cent. below the selling price of the dealer. Three hundred and twenty-seven of such cars were taken over and repurchased by Oakland at these very figures. Yet appellant wishes to reduce these items because the business of Stratton needed capital and there was a recession in trade and the general situation indicated an inability to realize such prices. But this argument seems dependent on Stratton's large overhead which may not have been necessary. It does not follow that the cars were worth only what would be their net yield to Stratton after charging them with their share of the huge expenses of an expanding business. It seems difficult to suppose that these new cars would not yield the cost price to the dealer. In the complaint the appellant alleged that the market value of the cars repurchased by Oakland was $300,000, whereas the cost price was $261,590.90. The record of sales of such cars for ten months in 1926 showed a profit of $462,446.27. Undoubtedly the overhead more than exhausted this profit, but it cannot be said that this was not due to the expenses of a too rapidly expanding business system. We cannot find that the trial judge reached a wrong conclusion in fixing cost as a fair value for these cars.

The used cars were carried at $100,140.-92, and the court valued them at $85,000. This was perhaps too high. The appellant was attempting at the trial to reduce the value to $70,000, and we think that figure is more reasonable than the one adopted. While used cars seem to have sold very close to the inventory price, these sales did not take into account all the expenses always connected with storing and marketing such commodities. The foregoing reduction will further lessen the assets in the statement of November 30, by $30,140.92.

The liabilities which appellant says are omitted and should be added to the statement are:

(1) Oakland parts on route, $25,015.79. The only testimony is to the effect that this item was already included in accounts payable, and so the District Judge found.

■ (2) Contingent Claim of General Motors Acceptance Corporation for $55,000. Where cars held on trust receipts were sold to the public, the customers' notes were guaranteed by Stratton to the Acceptance Corporation. The latter still had a lien upon the cars to secure the notes and there were reserves set up in the financial statement amounting to $21,-822.35 for these contingent liabilities. There is no proof that these cars were not worth enough in November and December, 1926, to satisfy the contingent liabilities. It is to be noticed that we have already excluded the item of $18,244.53 carried in the assets and allowed by the trial judge, which appeared to represent notes of customers who had purchased cars which Stratton had discounted. There was a contingent liability on these notes only if the customers broke their contracts and the cars would not satisfy the indebtedness. It is impossible to say that in November and December, 1926, the cars were not worth the difference of about $33,000 between the claim of $55,000 and the reserves set up, and there is nothing tangible to justify the conclusion that the finding of the trial judge was incorrect. Indeed, there was testimony that repossessed taxicabs were sold at a loss of only 1.6 per cent.

(3) Amounts due for advertising, $50,-751.96, and due Oakland for parts, $7,681.-90. These were included by the judge under the item "Oakland Car Account $58,433.86." He excluded the item $29,481.18 carried as a reserve to meet expenses of advertising and promotion. If the item of $29,481.18 be retained among the liabilities, the difference between $58,433.86 and $29,481.18—that is to say, $28,952.68—should be added to the liabilities.

(4) Accrued federal taxes amounting to about $5,000.

There are also to be included the following amounts added by the District Judge to the liabilities:

Purchase creditors...$35,000.00
Unadjusted remit-
    tance ............  5,000.00
Warehouse storage...  4,745.72
                  —————  $44,745.72

The effect of the above additional items would be to increase the liabilities appearing in the financial statement by $78,698.40.

As a result of the foregoing estimates: Assets are reduced

  by .............$116,630.89
Liabilities increased
  by ............  78,698.40
                  —————  $195,329.29

■ This sum of $195,329.29, if deducted from the balance of $276,937.13, shown by the financial statement after excluding good will and capital stock, still leaves a net worth, on November 30, 1926, of $81,607.84. Even assuming that there should be some further deductions, they could hardly be sufficient to make us differ with the conclusion of the trial court that Stratton was not proved insolvent on November 30, 1926.

Stratton, though pressed for money, was a going concern, doing a considerable business, when it arranged with Oakland to take over the cars. Its president not only believed his business would survive and insisted that it had a substantial value, but Oakland probably was of the same opinion. Stratton had spent a great deal of money and had done a large business the year before. Though, it was done at a loss, there was fair reason to believe that its aggressive policy and large advertising would bear fruit another season.

After the purchase of the surplus cars in November, and about December 16–18, Oakland made an examination of Stratton's affairs. Oakland's president, Glancy, had promised Stratton it would purchase its business at $50,000, more than the established value. The examination was with a view to such a purchase. By the time that examination was made Stratton had failed to meet a note for $100,000, due December 17. This examination disclosed Stratton's perilous and hopeless situation. It was without capital, and its business was running behind at $90,-000 per month. Glancy testified that he learned just before Christmas that the condition of Stratton was "horrible," and on or about December 20 Stratton was informed that the proposed purchase would not go through. The adjudication in bankruptcy followed ten days later.

■ In the circumstances, we cannot find that the purchase of the cars on November 18 and 30 involved preferential transfers. It is too rigorous to hold that a creditor apprehends bankruptcy and is seeking a preference because he secures payment from a debtor whose solvency is in some doubt and who may become insolvent in the near future.

The report of Stratton's secretary, McCoy, on November 1, shows how things stood and the need of $250,000 to carry Stratton through until spring, "when we all believe," says the report, "the Oakland and Pontiac will obtain a dominant position in our territory, as the result of our efforts this year." Even if Oakland had known the business conditions of Stratton in detail in November, 1926, we cannot say that it would not have been justified in taking payment of its claim as it did. While it knew Stratton was pressed for money, its books, the honesty of which is not impugned, showed a net worth of about $275,000 (Exhibit F). The facts resulting from the elaborate analysis of the value of the business made in the course of this litigation could not then have been known to Oakland. The valuations of new cars and accessories in the books was fair, and the valuation of used cars was not very far from the realizable value. We cannot say that Stratton was insolvent when the November transfers were made, or that, in November or early December, Oakland either knew or had reason to believe that the transfers would result in a preference.

■ The transfer of December 22 stands on a different footing. Then Stratton was desperate, had defaulted on its $100,000 note, was running behind at the rate of $90,000 per month for current charges, and Oakland would not act on the suggestion of its president to purchase Stratton's assets. The examinations of Stratton's affairs on December 16, 17, and 18 had revealed everything, and the situation had finally become one of known as well as real insolvency. It was too late to reduce expenses and attempt to wind up. Nothing but bankruptcy was likely to eventuate. In such circumstances, the transfer of Stratton's equity in the 32 cars, on December 22, in payment of Stratton's debt to Oakland, was an unlawful preference.

■ The appellants argue that Oakland should have paid for the equities in the cars in cash, instead of taking set-offs for all but $50,-000. Stratton said the agreement was to pay in cash, and the trial judge evidently believed him. But Stratton never claimed that Oak-

land in terms promised not to exercise the right of set-off or that the payment was to be a special deposit in Stratton's favor or was to be applied by Oakland in some specific way. Libby v. Hopkins, 104 U. S. 303, 26 L. Ed. 769; Lehigh Valley C. S. Co. v. Maguire (C. C. A.) 251 F. 581; Farmers' & Merchants' State Bank v. Park (C. C. A.) 209 F. 613. Stratton did say that Oakland promised to carry the advertising account indefinitely. But such a promise would not in itself prevent a set-off even now. Moreover, if there was a promise to pay cash, that was not an agreement to apply the moneys for a particular purpose, or to hold them as a special deposit. It involved no fiduciary relation, but only a promise by Oakland to pay Stratton. An agreement must be clear and specific to deprive a party of the ordinary right of set-off. Stratton was trying to get $250,000 from Oakland to tide his company through the winter, and was hoping against hope for ready cash, but he got no agreement not to set off and the right of set-off existed because the claims were mutual. But, in any event, complainants have pleaded no cause of action to recover a special credit, or to enforce a promise to pay in cash, and there is no assignment of error which attacks the decree because of any denial of such a claim. The only assignments of error which are of any importance are aimed at the failure of the court to find Stratton insolvent and to find that Oakland had reasonable cause to believe that such was its condition.

The decree is so modified as to allow the recovery by complainants of $2,242.26, with interest from December 22, 1926, and is otherwise affirmed, with costs to appellants.