## MITCHELL v. INVESTMENT SECURITIES CORPORATION.

No. 6931.

Circuit Court of Appeals, Fifth Circuit.

Nov. 25, 1933.

FOSTER, Circuit Judge, dissenting. .

---

T. Baldwin Martin, of Macon, Ga., for appellant.

Daniel MacDougald and Pope F. Brock, both of Atlanta, Ga., for appellee.·

Before BRYAN, FOSTER, and HUTCH-ESON, Circuit Judges.

HUTCHESON, Circuit Judge.

In April, 1931, the Case-Fowler Lumber Company transferred cash and securities to the Investment Securities Corporation, to pay a debt long past due. On May 6, on behalf of bondholders, a foreclosure suit was started and a receiver appointed. On May 8 the company, on its voluntary petition, was adjudicated a bankrupt. On the 17th of July the trustee filed this bill to set the transfer aside as preferential. The District Judge, upon full consideration, finding that the insolvency of the lumber company at the time of the transfer had not been proven, ordered the bill dismissed. The trustee, appealing, brings the record here for review. Fully recognizing the rule that though on an appeal in equity the reviewing court is not bound by the trial court's findings of fact, his findings ought not to be disturbed unless their error is clearly shown, he insists that upon the undisputed facts of record the findings and decree must be set aside as clearly wrong. The circumstances attending the transfer and the situation and prospects of the company when it was made are shown without dispute. They may be briefly stated.

In 1926 the Case-Fowler Lumber Company, which for more than ten years, many of

them very profitable, had been a manufacturer of and dealer in hardwood, had through the instrumentality of R. W. Courts bonded its plant for $500,000. The mortgage covered all of the assets of the corporation, the inventory as well as all of the physical properties, except notes, accounts receivable, and cash. This greatly impaired the company's credit position, and, since in only two of the years after the bond issue was there a profit from operations, its position in that regard at the time of the transfer complained of was desperate. In 1929 there was a loss of $278,-000; in 1930 of $347,000, not taking into account losses through the bad accounts of officers and loggers which, though carried on the books as assets, were in fact worthless, in excess of $206,000. In the spring of 1930, after Mr. Courts, who since the bond issue had been the financial adviser of the company, and the officers of the lumber company had been unable to obtain funds elsewhere, the company, to pay the spring interest and sinking fund on the bonds, borrowed from Mr. Courts' company, Investment Securities Corporation, without security except stock in the lumber company, put up personally by the president, $26,000. The fall interest and sinking fund was met, by along with other makeshifts, staving off the unsecured creditors. To add to its troubles, banks in which the company carried deposits seized them to apply against long overdue notes. The large sawmill at Macon which could not be operated except at a loss was shut down. In November, the company's affairs were at such a crisis that conferences, in which Mr. Courts participated, were called to consider ways and means of obtaining the operating money, which was absolutely essential to the company's keeping on. In these conferences it was freely stated that the company was broke; that the unsecured creditors would not get 10 cents on the dollar if it was liquidated, and one of the refinancing plans suggested involved the entire elimination of the unsecured creditors. This plan the officers of the company testified they rejected as unfair. Of these conditions Courts was fully aware, having floated the bond issue for the company, and, being one of its unsecured creditors, he kept in active touch with it. Working with the banks, securing extensions from the Union Trust Company, one of the unsecured creditors, endeavoring to enlist new capital, he corresponded with the banks and the creditors with a view to carrying the company along, and, if possible, reviving it. Ever mindful, however, of the $26,000 his company had advanced, which, though secured by the stock of Mr. Fowler in the lumber company he regarded as unsecured, in September, 1930, he wrote a "personal" letter to the president of the Case-Fowler Company, asking assurances that his company would be preferred ahead of other creditors, in the event of a crisis. He wrote: "I told the Investment Securities Corporation that this money, being new money, you would regard it as a loan; that you would take care of ahead of other loans in any time of crisis. Therefore I want you to protect me in this. Of course we do not expect any crisis, but in that event we would do all we could to work out the situation satisfactorily." In reply to this letter the lumber company wrote: "We wish to assure you that we will protect you, should any crisis arise." The record does not show that this understanding was ever communicated to any other of the unsecured creditors. On the contrary, they assumed that Mr. Courts was working for the interest of all alike. The Union Trust Company wrote him in January, 1931, expressing the hope that his efforts might "lead to some plan of putting Case-Fowler out of the situation they are now in. Should the efforts not succeed it seems to us that we should get together and come to some conclusion about a prompt and complete liquidation of Case-Fowler," while on April 10, about the time the transfer was being carried out by remittances drawn to prevent their seizure by bank creditors,[1] the trust company wrote him again: "I understand that a default has either been made or is about to be made on the bonds. If this is the case it looks like the unsecured creditors are up against it. I believe you are in the same boat with us to some extent. * * * In any event, I am counting on you to pull us out of this fix."

Instead of improving after these conferences, the situation of the company became more desperate, not only on account of its own particular situation, but because of the general outlook which caused practically every other hardwood plant in Georgia to shut down. The hardwood lumber market as such was nonexistent. What was sold had to be sold at a constantly decreasing price, each buyer practically dictating what he would pay. Only by heavily discounting its acceptances with what one witness called "loan sharks" and keeping the fact concealed[2] was

[1] Letter from H. C. Fowler, R. p. 115: "After considering the matter we decided it would not be advisable to mail your check from one of our local banks."

[2] Testimony of MacEwan, record p. 50: "We did not want it generally known that we sold our accounts to loan sharks."

the company able to go on at all. The time approaching for the spring interest and sinking fund requirements, and there being no way to meet them except by using the surrender value of Mr. Fowler's insurance and a note or two the company had which were negotiable, which would leave the company more strapped than ever, Courts was appealed to to go to Baltimore and secure an extension from the bondholders, and get up a sufficient fund of new money to use as operating capital. Realizing that the crisis had arrived, Courts insisted that the debt of his company be paid, promising, however, if it should be, to use his best efforts to obtain the extension and new capital, and agreeing that, if sufficient new capital could be gotten to put the company on its feet, to have his company contribute $50,000 to the fund. He insisted that he could not consistently either ask for or furnish any part of the new capital while his company was a creditor on paper so long overdue. Arrangements were then made to pay the debt in part with the cash surrender value of Mr. Fowler's policies, and in part by turning over part of the small amount of negotiable paper the company had. At Mr. Courts' suggestion, a statement of the company's assets and liabilities was then prepared as a basis for the application for the extension and the new capital which he had agreed to make. This statement, prepared as to fixed assets on the basis of cost less depreciation, showed fixed plant equipment and mill sites, $559,000, current, $517,000. This was made up of lumber, log, and timber inventories $420,000, and a small amount of cash and accounts receivable. Of this statement the only items representing actual amounts were the liabilities. The asset items, except the small cash, were estimates which in the case at least of fixed assets had no real relation to the present actual fair value of the property, and none whatever to its value as a means of discharging the company's debts. Plaintiff's witnesses, except the officers of the company, attempted to appraise the assets at their convertible cash value; one of them appraised the whole, including the lumber, at $279,000; others appraised only part. Taking them singly and together, the testimony of these witnesses presents a picture of total and complete insolvency. The testimony of the officers of the company was in substance that, viewing the company as a going concern, the estimate was fair, but they recognized that, unless new life could be imparted to the company and it could be made to go on, conditions in the business were such that the fixed assets could not be sold or utilized by anybody at any substantial figure, and that the only real value they had was as junk.

Defendant's main reliance for proof of solvency, apart from its going concern theory, was on the lumber inventory. This was variously estimated in the testimony at from $168,000 to $275,000. The District Judge, saying he thought a valuation of $255,000 for the lumber was reasonable, and taking the going concern value of the plants and equipment, found the company solvent.

Appellant, insisting that this disposition did violence to the actual in favor of a theoretical condition, comes here arguing that, when the transfer was made, the company was, within the meaning of section 1, clause 15, of the Bankruptcy Act (11 USCA § 1 (15),[3] completely insolvent.

We think appellant is right. While it is certainly true that, where the bankrupt was a going concern at the date of the transfer, that fact must be taken into consideration in fixing fair values, and scrap or junk values will not do, if the concern, though nominally alive, is in fact dead on its feet, going concern values may not be taken, for a company can have no going concern value unless it is really, and not merely nominally, a going concern. In re Fred D. Jones Co. (C. C. A.) 268 F. 818. We think the statute defining insolvency in connection with preferential transfers makes this entirely clear. In effect, it defines it to be a condition of permanent, as opposed to temporary, inability to pay debts. It declares one insolvent when his ability to pay his debts is not temporary through want of ready funds, but permanent through want of convertible assets. Statutory as well as commercial insolvency arises out of, and consists in, inability to pay debts. One is insolvent under the statute when his assets, if converted into cash, at a fair not forced sale will not pay them. In both cases solvency is tested by ability to pay debts, in the one case promptly, in the other, in time. In testing both kinds of insolvency, the realities of the situation control. In both kinds it is the actual, rather than the theoretical, condition of the debtor which determines it. Mente & Co. v. Old River (D. C.) 3 F.(2d) 38; In re Smith (D. C.) 3 F.(2d) 40, 41; Louisiana National Life Assur. Society v.

[3] Section 1, clause 15: "A person shall be deemed insolvent within the provisions of this title whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

Segen (D. C.) 196 F. 903; Hard & Rand v. Biston Coffee Co. (C. C. A.) 41 F.(2d) 625; Gates v. First Nat. Bank (D. C.) 1 F.(2d) 820; Updike v. Oakland Motor Car Co. (C. C. A.) 53 F.(2d) 369.

When in the light of this statute the situation existing when the transfer was made is squarely faced, and all its factors are taken into consideration, the company's lack of credit, its lack of market, the total paralysis of the hardwood industry, the strangling pressure of the blanket bond issue, the pall of its heavy annual losses, and the absolute proven certainty that, unless conditions changed, such losses would follow continued operation, we think the conclusion unavoidable that the company was then starkly insolvent and staggering to its fall.

What has been said as to the company's condition, and Courts' connection with and knowledge of that condition, what has been said regarding his insistence that, when the crisis, the imminence of which all foresaw, should come on, his debt should be preferentially paid ahead of the other creditors, together with the very circumstances of the transfer, make it unnecessary to say more upon the issue of the knowledge of defendant that it was being preferred than that the fact of that knowledge stands grimly out, beyond the possibility of question. Every factor in the situation was known to Courts; no one knew better than he that the company was tottering to its fall. When, in its extremity, he took from it to pay his debt its last feeble crutch, the money it had counted on to pay the interest and sinking fund on the bonds, he demonstrated far more effectively than any amount of affirmative testimony could do that he knew its time had come.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

FOSTER, Circuit Judge (dissenting).

The majority opinion apparently is based on the conclusion that, because the bankrupt was not doing a profitable business, it had ceased to be a going concern, and its plant and the stock of lumber on hand had no immediate market value, and therefore neither was to be considered an asset available for payment of its debts. I do not agree with this conclusion. The total liabilities as shown by the record amounted to $537,462.80. The value of the lumber at the lowest estimate shown, $20 per thousand feet, was $266,666.-66. The value of the plant and equipment, estimated on the basis of replacement cost, less depreciation, the method almost universally adopted by the courts in estimating fair value in rate cases, was $519,652.24. A fair value given the mill site was $39,904.97. There was also cash on hand to the amount of $11,674.68. There were other assets listed amounting to over $100,000. Leaving this last figure out of consideration entirely, and liberally discounting the estimate of the value of the lumber, mill sites, plant, and equipment, the bankrupt was solvent at the time the payment was made to appellee. The record also supports the conclusion that, in making the payment to appellee, the intention was to bring in new capital and to secure an extension of the bonded indebtedness, rather than to favor an insistent creditor. My conclusion is that the bankrupt was solvent at the time the payment attacked as a preference was made and the judgment of the District Court was right.

For these reasons I respectfully dissent.